[No. 28984. Department One. July 6, 1943.]

ARTHUR CARON *et al., Appellants,* v. GRAYS HARBOR COUNTY, *Respondent,* HAROLD KELLOGG *et al., Defendants.*[1]

'Reported in 139 P. (2d) 626.

*Gladys Phillips* and *Hogan & Adams,* for appellants.

*John D. MacGillivray,* for respondent.

STEINERT, J.—Plaintiffs, husband and wife, brought suit against Grays Harbor county and two members of

the board of county commissioners to recover damages for personal injuries sustained by the plaintiff wife in consequence of slipping and falling from a ladder in the county clerk's office. Defendants' answer consisted of a general denial and three affirmative defenses alleging failure on the part of plaintiffs to file a proper claim, assumption of risk, and contributory negligence. The allegations of the affirmative defenses were in turn denied by plaintiffs. At the conclusion of plaintiffs' evidence, the action was dismissed as to the two commissioners. The defendant county's motions for dismissal, made both at the close of plaintiffs' case and at the conclusion of the entire evidence, were denied. The jury returned a verdict in favor of plaintiffs against the county. The court later granted the county's motion for judgment notwithstanding the verdict and dismissed the action in its entirety. Plaintiffs appealed. We shall hereinafter refer to the complainant wife as though she were the sole appellant.

At the time of the accident involved in this action, appellant was, and for about thirteen years prior thereto had been, employed as an abstractor for a title company in Montesano. Her customary duties required her to examine records and documents in the county clerk's office, and for that purpose she visited that office almost daily and spent much of her time there.

The files and records pertaining to superior court actions were kept in metal filing cases and in larger filing cabinets, in a vault room located underneath the main floor of the clerk's office. The filing cases were of the oblong type, having handles in front, by means of which the metal containers could be pulled outward and pushed inward by persons using them. These cases were arranged in tiers along the walls of the vault room and rose upward from the floor almost to the ceiling.

In front of one of these blocks of filing cases was a wooden ladder, which was used to gain access to the

upper containers. The ladder was connected by means of sheaves with a wooden railing or bar bolted to, and running along, the top of the filing cases in that block. The foot of the ladder rested upon the floor of the vault, a few feet out from the bottom tier of these filing cases. Attached to the top and to the bottom of the ladder were sets of wheels, thus enabling one readily to push it laterally along the front of the filing cases to any point desired.

In the course of time, and for a period of at least a year prior to the day of the accident, the ladder had become partially loose and out of repair, particularly at its upper end, so that the top wheels were no longer held securely in place. Under that condition, the bottom part of the ladder could be pushed inward several inches closer to the base of the filing cases, with the result that its upper wheels would then become disengaged from, and elevated above, the track which ran along the edge of the upper tier of filing cases.

In the middle portion of the vault room, and extending parallel with the filing cases above described, stood a row of large metal filing cabinets of the modern type. These cabinets, five tiers high, and with their backs toward the filing cases, were set evenly in line with the path along which the foot of the ladder customarily ran, but so close thereto as to make it somewhat inconvenient for persons to gain access to the lower rungs of the ladder. The tops of the filing cabinets had sharp edges.

The floor of the vault room was covered with battleship linoleum, of the same kind as that which covered the floor of the courtroom in which the trial of this case was held. About once a year, the janitor waxed the linoleum, using the best grade of wax obtainable.

For many years the county clerk had permitted appellant and others to have uninterrupted access to the vault for the purpose of examining the files and records kept therein. This practice was followed largely be-

cause the clerk was short of office help, one of whom would otherwise have been required to bring the requested files from the vault to the main office for examination by the public. It further appears that for a long time prior to the accident the county clerk had complained to the county commissioners concerning the general condition of the vault, particularly with reference to the stairway leading down to it and the crowded area of the room itself, but also with reference to the rickety condition of the ladder. However, the commissioners did nothing about it. As will be more fully. stressed later, appellant was well aware of the condition of the ladder and floor, and of the arrangement of the oblong filing cases, the larger metal cabinets, and the other paraphernalia in the vault.

On the morning of April 22, 1940, appellant went to the clerk's office, as usual, for the purpose of examining certain records. The particular file in which she was interested was to be found in one of the oblong filing cases located in the ninth tier from the floor, thus necessitating use of the ladder. Because of the narrowness of space between the ladder and the large filing cabinets occupying the middle portion of the vault floor, appellant pushed the ladder inward several inches toward the filing cases, before attempting to mount it. This had the effect of lifting the top of the ladder above its track on the railing overhead. She had frequently followed that practice before without any mishap.

She then proceeded up the ladder to about the fifth or sixth rung from the bottom and, while holding on to the side of the ladder with her right hand and arm, reached toward the desired filing case with her left hand. While in the act of pulling the case outward, the foot of the ladder slipped back to its accustomed position. This caused appellant to lose her balance. In an effort to keep from falling, she clung to the filing case, but when that too gave way she fell backward, striking the lower part of her spine against the sharp

edge of the filing cabinet which stood near the ladder.

Unable to continue with her work, because of the shock and pain, appellant went upstairs and then back to the office of her employer, where she remained until after lunch, and then went home. Throughout the remainder of the day and all that night she suffered intense pain and distress. The next morning she summoned a doctor who, after examining her, sent her to a hospital where X-ray pictures of her back were taken, revealing a compression fracture of the second lumbar vertebra. Appellant was thereupon placed in a plaster cast, in which she remained for eight or more weeks.

While in the hospital, appellant requested Mrs. Lota King Wiley, the county auditor of Grays Harbor county, to prepare and present for her a claim for damages against the county. Mrs. Wiley drafted the claim, signed and verified it on behalf of the appellant on May 6, 1940, and presented it at a regular meeting of the commissioners held on June 17th. It is conceded that the claim was defective in several respects, to which further reference will be made later.

In her amended complaint, upon which the action was ultimately tried, appellant alleged that the defendants waived the filing of any additional or more complete claim and that they were therefore estopped to deny that the claim was in compliance with the pertinent statutory requirements. Mrs. Wiley, the county auditor, called as a witness for the appellant, testified that, when she presented the claim to the county commissioners at their meeting of June 17th, she specifically called their attention to the fact that the claim did not state the amount of damages sought and did not accurately describe the defects which caused the accident; and that the commissioners, through the chairman, then and there declared that the claim was all right, and that no further detail was necessary, and, further, directed her to advise appellant "not to worry, that everything is all right; the claim is sufficient." While the

auditor's testimony was squarely contradicted by the defendant commissioners, it presented a question of fact to be decided by the jury unless we should now hold as a matter of law that there was no waiver of compliance with the statutory requirements.

In granting the motion for judgment notwithstanding the verdict, the trial court based its decision on the ground that appellant had failed to file a proper notice of claim for damages as required by law.

█ Rem. Rev. Stat., § 4077 [P. C. § 1664a], provides that all claims for damages against any county must be presented before the county commissioners of such county and filed with the clerk thereof within sixty days after the time when such claim for damages accrued. The material provisions of that statute, so far as this action is concerned, read as follows:

"*All* such claims for damages *must* locate and describe the defect which caused the injury, describe the injury, and contain the amount of damages claimed, together with a statement of the actual residence of such claimant at the time of presenting and filing such claim and for a period of six months immediately prior to the time such claim for damages accrued, and be sworn to by the claimant. *No action shall be maintained for any claim for damages until the same has been presented to the board of county commissioners* and sixty days have elapsed after such presentation. . . ." (Italics ours.)

The verified claim upon which this action is predicated deposes:

"To Grays Harbor County
For Blanche Caron
"The undersigned, Lota King Wiley, on behalf of Blanche Caron hereby presents a claim to said county for damages to the person of said Blanche Caron, caused from a fall while carrying on her general duty as an abstractor while searching files in the vault of the Clerk's office of said county, on April 22nd, 1940.
"Said Blanche Caron was on a ladder extracting a file case when the case failed to hold causing the ladder

to slip and the said Blanche Caron to fall and injure her back.

"Said Blanche Caron is now in the hospital and unable to make this claim for herself and at her request, the undersigned, is therefore making the claim in her behalf. . . .

"Dated this 6th day of May, 1940.

"Lota King Wiley (Signed)

"State of Washington ⎱ ss.
County of Grays Harbor ⎰

"Lota King Wiley, being first duly sworn on oath deposes and says; that she hereby makes the above claim for Blanche Caron at her request, that she has read the foregoing claim for damages, knows the contents thereof and that the same is true.

"Lota King Wiley (Signed)

"Subscribed and sworn to before me this 6th day of May, 1940.

"Ruth W. Armbrust (Signed)

"Deputy County Auditor, Grays Harbor County, Wash."

(Seal)

It will be observed (1) that the claim as presented merely stated that the *file case failed to hold,* causing the ladder to slip, but described no *defect* in either the file case or the ladder; (2) that it stated only generally that the fall caused injury to appellant's back, but did not describe the nature of the injury; and (3) that it did not state the amount of damages claimed.

In her complaint, served and filed long after the expiration of the time allowed for presenting a proper claim in this instance, appellant alleged that the respective defendants were negligent in failing to furnish her with a safe place in which to examine files; in allowing the ladder to become loose on the track and out of repair; in maintaining a highly polished floor where the wheels of the ladder might, and did, slip, causing appellant to fall and injure her back; and in failing to provide adequate space, between the ladder and filing cabinets, for appellant and others to ascend and descend the ladder without having their backs in-

jured on the sharp edges of the filing cabinets. The complaint further alleged damages in the sum of $12,477. The evidence adduced by appellant followed and tended to support the allegations of her complaint.

It is apparent that the claim as filed did not comply with the essential requirements of the statute above set forth, and appellant frankly concedes that the claim was defective in that it did not state the amount of damages claimed and did not set forth "in detail the defects which caused the accident." It is also apparent that the defects and acts of negligence upon which appellant based her cause of action, as set forth in her complaint, are radically different from the verified claim which was originally presented on her behalf by the county auditor. In this connection, it may be stated that the evidence clearly discloses not only that appellant herself could have verified the claim on May 6, 1940, but also that from that time on she was physically and mentally competent to supply all the details necessary to constitute a valid claim in compliance with the statutory requirements.

It is definitely settled in this state that the filing of a claim in accordance with Rem. Rev. Stat., § 4077, is a condition precedent to the maintenance of an action for damages against a county. *Old Nat. Bank v. Lewis County,* 137 Wash. 436, 242 Pac. 961; *Shaw Supply Co. v. King County,* 169 Wash. 175, 13 P. (2d) 472; on rehearing, 172 Wash. 137, 20 P. (2d) 8; *Holmquist v. Queen City Const. Co.,* 175 Wash. 681, 27 P. (2d) 1066; *Boitano v. Snohomish County,* 11 Wn. (2d) 664, 120 P. (2d) 490. As stated in the *Shaw Supply Co.* case, *supra,*

"The statutes requiring claims to be presented to that board declare a rule of policy, and the courts are not at liberty to ignore it, even though they might be persuaded in a particular case that it was a useless ceremony."

Although we have frequently said that statutory provisions respecting the presentation of claims for torts against a municipality are to be liberally construed, we have always proceeded upon the principle that there must be a *substantial* compliance with such requirements. *Sopchak v. Tacoma,* 189 Wash. 518, 66 P. (2d) 302; *Duschaine v. Everett,* 5 Wn. (2d) 181, 105 P. (2d) 18, 130 A. L. R. 134, and cases therein cited. See, also, *Johnson v. Seattle,* 9 Wn. (2d) 231, 114 P. (2d) 972. In the *Sopchak* case, *supra,* we said:

"Data not already included therein in some form cannot be supplied by any method of construction, however liberal."

The inescapable logic of these rules, as just stated, when taken together, is that *substantial* compliance with the statute is a condition precedent to the maintenance of an action for damages against the municipality; or, expressed in another way, the filing of a claim which does not substantially comply with the statute has the same legal effect as a failure to file any claim at all.

Appellant's contention upon the appeal is that under the evidence the jury was entitled to find that, in so far as the defects of her claim are concerned, the county and its commissioners had waived compliance with the requirements of the statute. This presents the question as to whether the county commissioners had the authority to waive substantial compliance with the statute and by such attempted waiver estop the county from now asserting a lack of such compliance. It is conceded by both counsel that this exact question has never been specifically determined by this court. There is, however, a wealth of general authority upon the subject, and, concededly, the authorities are not all in harmony with each other. While there are some decisions to the contrary, the weight of authority is, in our opinion, clearly to the effect that

municipal officers do not have the power or authority to disregard the plain, mandatory provisions of claim statutes and may not waive substantial compliance therewith. We take the liberty of quoting from a few of the decisions and citing a partial list of others upholding the rule.

In *Grambs v. Birmingham,* 202 Ala. 490, 80 So. 874, where the plaintiff had failed to set forth in his claim the "street and house number where the party injured resides," as required by the applicable statute, the court said:

"Whatever may be said of the effect of this statute in a case where the governing authorities of the municipality cause a claim to be paid without the filing of a sworn statement, or in a case where the plaintiff is allowed to recover without the objection being taken that he has failed to comply with the statute, it follows from what has been said that when the claimant must needs resort to the courts, he can only prevail against a diligent defense by alleging and proving that he has filed a statement according to the substantial requirements of the statute. This is the plain effect of the act, imposing conditions upon the maintenance of an action allowed by the statute, and the court has no authority to give it any other. Some of the courts have assumed to ingraft upon similar statutes provisos which permit waivers, but the weight of authority sustains our statement as to the law of the case."

In *Cooper v. County of Butte,* 17 Cal. App. (2d) 43, 61 P. (2d) 516, the claim was not verified as required by statute. In dismissing the action, the appellate court said:

"Neither can we support appellant in his contention that the county or its officers can waive the provisions of Act 5149 in regard to the verification of claims, nor can a county be estopped from asserting as a defense, a failure of a claimant to verify his claim in accordance with that act.

"  . . .  The statute does not authorize a waiver nor does it provide any substitute for a written verified claim. The authorities we have cited quite generally

hold that actual knowledge on the part of officers of a municipality of the facts required to be stated in the claim does not dispense with the claim itself. . . .

"In 18 California Jurisprudence, page 799, it is said:

" 'Want of power is always a defense to a municipal corporation, and no estoppel, by conduct or by ratification, to raise a defense can be urged against such a corporation. If the rule were otherwise, the corporation, by ratification, could validate an act, void as being *ultra vires*, and no limit could be set to its powers.' "

In *Rich v. Eastport,* 110 Me. 537, 87 Atl. 374, the claim was defective in two of the particulars involved in the case at bar. The court said:

"It [the claim] was manifestly fatally defective in at least two particulars. It makes no claim for damages. . . . It does not specify the nature of the injuries. . . .

"But the plaintiff argues that the case elsewhere shows that the municipal officers knew otherwise all that a perfect notice would have shown them, and that by their conduct they had waived the imperfections in the notice. Neither point is well taken. The knowledge of the municipal officers is immaterial. The written statutory notice is an indispensible prerequisite to the right to maintain a suit. . . . The municipal officers cannot waive."

In *Berry v. Helena,* 56 Mont. 122, 182 Pac. 117, the claim did not accurately state the time when the injuries were received. In affirming a judgment upon nonsuit, the supreme court used this language:

"Before any liability whatever attaches for injuries resulting from defective streets or sidewalks, the city must have received the notice prescribed by section 3289 above. That section is not in any sense a statute of limitations. Its provisions cannot be waived, for they are intended for the benefit of the public whose money must be appropriated to the payment of any damages recovered. . . .

"It is not an answer to say that the city officials obtained correct information from other sources and were not misled. The only right which plaintiff can assert against the city is the right granted by statute.

Compliance with the law on her part is a necessary prerequisite to her right to institute this action, and an appropriate allegation of such compliance is an indispensable part of the statement of a cause of action."

Among the many cases holding to the same effect as those above cited are the following: *McCall v. Birmingham*, 234 Ala. 164, 174 So. 630; *Spencer v. Calipatria*, 9 Cal. App. (2d) 267, 49 P. (2d) 320; *Powers Farms, Inc. v. Consolidated Irrigation Dist.*, 19 Cal. (2d) 123, 119 P. (2d) 717; *Hall v. Los Angeles*, 19 Cal. (2d) 198, 120 P. (2d) 13; *Miramar Co. v. Santa Barbara*, 122 P. (2d) (Cal. App.) 643; *Nicholaus v. Bridgeport*, 117 Conn. 398, 167 Atl. 826; *Rogers v. City and County of Honolulu*, 32 Hawaii 722; *Walters v. Ottawa*, 240 Ill. 259, 88 N. E. 651; *McCarthy v. Chicago*, 312 Ill. App. 268, 38 N. E. (2d) 519; *Touhey v. Decatur*, 175 Ind. 98, 93 N. E. 540, 32 L. R. A. (N. S.) 350; *Blair v. Fort Wayne*, 51 Ind. App. 652, 98 N. E. 736; *Rushville v. Morrow*, 54 Ind. App. 538, 101 N. E. 659; *Starling v. Incorporated Town of Bedford*, 94 Iowa 194, 62 N. W. 674; *King v. Boston*, 300 Mass. 377, 15 N. E. (2d) 191; *Reid v. Kansas City*, 195 Mo. App. 457, 192 S. W. 1047; *Borst v. Town of Sharon*, 24 App. Div. 599, 48 N. Y. S. 996; *Pender v. Salisbury*, 160 N. C. 363, 76 S. E. 228; *Batchelder v. White*, 28 R. I. 465, 68 Atl. 320; *Hamilton v. Salt Lake City*, 99 Utah 362, 106 P. (2d) 1028.

Three states, Michigan, Texas, and Virginia, hold that the mandatory provisions of similar statutes may be waived. See *Nevala v. Ironwood*, 232 Mich. 316, 205 N. W. 93, 50 A. L. R. 1189; *Cawthorn v. Houston*, 231 S. W. (Tex. Civ. App.) 701; *Bowles v. Richmond*, 147 Va. 720, 129 S. E. 489, 133 S. E. 593.

We are of the opinion that the majority rule is in accord with the positive declaration and the manifest intendment of our own statute, and that at least a substantial compliance with its requirements is an essential prerequisite to the maintenance of an action for damages against a municipality, including a county.

The adoption of such a rule not only affords the municipality a full opportunity to make a complete and intelligent investigation of the facts concerning the claim, but will also provide a safeguard against favoritism, negligence, or inattention on the part of officials to whom the affairs of the municipality are committed. Since, as we have heretofore indicated, the claim in question did not substantially comply with the essential requirements of the statute, the present action cannot be maintained.

Respondent's motions at various stages of the proceeding, including its motion for judgment notwithstanding the verdict, not only attacked the sufficiency of the claim, but also presented the questions of assumption of risk and contributory negligence on the part of appellant. The trial court rested its decision exclusively upon the matter of insufficiency of the claim. Respondent in its brief on appeal urges its other contentions, and appellant in her reply brief has advanced counter argument. In view of the fact that we have decided the question of insufficiency of the claim as a matter of first impression in this court, and recognizing that our decision upon that point, alone, would foreclose consideration of other questions of vital concern to both parties, we have deemed it fitting and proper to examine and express our view upon the matter of the right of the appellant to recover damages in any event, under the facts and circumstances shown by the record herein, and to rest our decision equally thereon.

As stated above, in her purported claim appellant assigned as the cause of the accident *the failure of the filing case to hold,* whereupon the ladder slipped, resulting in her fall and injury. In her complaint and upon the trial, however, appellant forsook that hypothesis and predicated her right of recovery upon a claim that the ladder was defective, the floor slippery, the area between the ladder and filing cabinets

crowded, and that the county commissioners had negligently failed to furnish her with a safe place to work.

■ The case was tried upon the theory that appellant, while working in the vault, was an invitee, as that term is understood in the law. The general rules with respect to the duty and liability of the owners of premises to their invitees are well understood. As stated in 45 C. J. 837, Negligence, § 244,

"The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care. The invitee assumes all normal or ordinary risks attendant upon the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers, nor is he liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care."

And, as said in 38 Am. Jur. 757, Negligence, § 97,

"The liability of an owner or occupant to an invitee for negligence in failing to render the premises reasonably safe for the invitee, or in failing to warn him of dangers thereon, must be predicated upon a superior knowledge concerning the dangers of the premises to persons going thereon. It is when the perilous instrumentality is known to the owner or occupant and not known to the person injured that a recovery is permitted. . . .

"There is no liability for injuries from dangers that are obvious, reasonably apparent, or as well known to the person injured as they are to the owner or occupant."

■ While the terms "assumed risk" and "contributory negligence" are often used in conjunction with each other to denote the reason for precluding recovery for personal injuries, the doctrine of "assumption of risk," as understood in this state, is said to apply more nearly to those cases where the relation of master and servant or some similar relation exists, rather than to

the relation of proprietor and invitee. *Nelson v. Booth Fisheries Co.*, 165 Wash. 521, 6 P. (2d) 388. In the latter relation of proprietor and invitee, denial of recovery is, in like circumstances, usually rested upon the principle of "contributory negligence," although this court has at times spoken of it as the assumption of an attendant risk. See *Polk v. Spokane Interstate Fair*, 73 Wash. 610, 132 Pac. 401; *Kavafian v. Seattle Baseball Club Ass'n*, 105 Wash. 215, 177 Pac. 776, on rehearing, 105 Wash. 219, 181 Pac. 679; *Hogan v. Metropolitan Bldg. Co.*, 120 Wash. 82, 206 Pac. 959; *Juntila v. Everett School Dist. No. 24*, 183 Wash. 357, 48 P. (2d) 613. In the *Polk* case, *supra*, appears the statement:

"The owner of the premises is liable in damages to those coming to them at his invitation, who, while in the exercise of due care, are injured because of some unsafe or negligent condition; but it is equally true that, when one voluntarily and willingly puts himself or his property in danger, there is a presumption that he assumes all the risks reasonably to be apprehended from such conduct. In cases of this kind, this assumption is called contributory negligence, and is as much a defense in these cases as to any other to which it may be applied."

While the relation of master and servant offers the most conspicuous example of situations involving the doctrine of assumption of risk, it is by no means the only relation to which the doctrine may be applicable. As stated in Harper on Torts, 290, § 130:

"The doctrine of voluntary assumption is a crystallization of the idea expressed in the latin maxim volenti non fit injuria and was thought for a time to be applicable only to situations arising out of the relationship of master and servant, as an implied term of the contract. It is clear, however, that it is 'implied' by the law and not by the contract, and by reason of the relation between the parties. It thus is applicable to voluntary relations other than those of employer and employee."

Whether the one term or the other be used, they both have reference to the same thing in cases where knowledge by the injured party of an obvious danger is involved. In the following cases, the general principle above stated was applied as a bar to recovery by invitees: *Hogan v. Metropolitan Bldg. Co., supra; Viles v. Thunborg,* 164 Wash. 190, 2 P. (2d) 666; *Juntila v. Everett School Dist. No. 24, supra.* Among the many cases which applied the same general principle to the relationship of master and servant, though designating the principle as assumption of risk, are the following: *Snyder v. Lamb-Davis Lbr. Co.,* 64 Wash. 587, 117 Pac. 399; *Dahl v. Puget Sound Iron & Steel Works,* 77 Wash. 126, 137 Pac. 315; *Brandon v. Globe Inv. Co.,* 108 Wash. 360, 184 Pac. 325, 10 A. L. R. 286; *Jones v. Baker,* 179 Wash. 25, 35 P. (2d) 1103; *Freeman v. Smit,* 193 Wash. 346, 75 P. (2d) 575.

The established facts in the case at bar bring it clearly within the rules announced in the foregoing authorities. Appellant had used the premises and equipment within the vault almost daily for a period of thirteen years. She knew the arrangement of the filing cases, filing cabinets, and ladder, and their location with reference to each other. She had upon frequent occasions used the ladder and knew that it was loose at the top. She was also conversant with the character and condition of the linoleum on the floor. In the course of her examination, she testified as follows:

"Q. Mrs. Caron, you had been working for the title company for how long previous to April 22nd, 1940? A. About thirteen years. Q. And had you been doing the same type of work over that thirteen years? A. I had. Q. And over that thirteen years you were in the vault room of the Clerk's office practically every day? A. Yes. . . . Q. And every time that you did go down in the vault room, and you were down there on an average of an hour, you used this ladder, and had used the ladder? A. We didn't have to use it for every file we got out. There were files in the center of the

room on the floor. Q. Well, did you use it practically every day for thirteen years? A. Well, I,—practically, I suppose. Q. Practically every day for thirteen years? A. Yes. Q. Previous to April 22nd, 1940? A. Yes. . . . Q. And the same ladder, in the same position was there in 1927 when you started to work as was there on April 22nd, 1940? A. Yes. Q. In other words, the conditions have not changed one bit then in the thirteen years? A. I presume the ladder would wear some in twelve or thirteen years. Q. You presume? A. Most any other piece of machinery does. Q. Well, from your continued use of it did you notice that it was wearing? A. It was getting looser. Q. Getting looser? A. Yes. Q. When did you start to notice it was getting looser? A. Well, I couldn't state definitely. Q. Well, five years before 1940? A. Possibly a year or so. Q. And when you speak about it being looser you mean looser where? A. On the rack. Q. On the rack? A. It had more play back and forth. Q. Which way? A. Across the floor, sideways, out from it. Q. You mean back and forth out from the filing cabinet? A. Out from the filing cabinet. . . . Q. You used, I presume, and had used the ladder more than any one else around the courthouse? A. Possibly as much. . . . Q. Now, on April 22nd, Mrs. Caron, I understand that when you started to get on this ladder you pushed the bottom of it forward here about two or three inches, is that correct? A. Yes. Q. And that was because there was play at the top and you could push it in? A. Yes. Q. It had become loose and had been for at least a year? A. Yes. . . . Q. You realized there was some danger and risk by using the ladder? A. Yes. They were going to have it changed. Q. How long had you realized there was some risk by using this ladder? A. Possibly a year. Q. And over that year you used the ladder practically every day? A. Yes, we had to get the files. . . . Q. Well, what was unsafe about this place in which you were working then? A. The ladder was rickety and very little room between the ladder and those file cases. Q. And you knew all that? A. Yes, I knew it. Q. You knew that was unsafe for anyone working down there? A. I didn't think it would cause me to fall. I knew it was shakey. Q. You knew it was shakey and unsafe? A. Yes. . . . Q. . . . You alleged in your complaint that the com-

missioners, Mr. Kellogg and Mr. Aarhaus were negligent in that they had a slick, highly polished floor down there, is that correct? A. The floor was highly polished. Q. Was the floor any different than this floor right here? A. Linoleum like this floor. Q. And in the same condition as this floor? A. About the same. Q. And whether it was highly polished or like this floor you knew the condition of the floor down there, didn't you? A. Yes. Q. You were down on that floor every day? A. Practically. . . . Q. And you say it was necessary for you to jam the base of that ladder forward towards this wall in order for you to get on the ladder? A. Yes, there is very little room in there, it is natural to push on the ladder when you start up. Q. Now, you have worked in that very position before there a lot of times, I suppose? A. Yes. Q. And was that your habit to push the base of the ladder forward as you got on it? A. As you put your hand up on the ladder, where it was loose naturally it would slide toward the filing cabinet. Q. You say it would slide maybe two inches or so? A. Yes. . . . Q. Mrs. Caron, to get it straight, the defect in the ladder that you are now complaining of was that it was loose at the top? A. Yes. Q. And it had been loose on the 21st of April, 1940, on the 20th? A. Yes. Q. And for at least a year? A. Yes. Q. And you knew it? A. Yes."

It is apparent, from what has been said, that everything about which appellant complains was open and obvious, and that she knew as much as, or more than, anyone else about the defective, as well as inconvenient, conditions of the equipment. In fact, it was her own act of pushing the ladder inward toward the filing cases that lifted the upper wheels from the railing, causing the ladder to slip back to its natural position when she placed her weight upon the rungs. It is true, she testified that the ladder had never slipped that way before and that she did not know that there was any danger of any such eventuality. However, it was not intended that the lower part of the ladder should be pushed forward, and had its upper portion been secure it could not have been so misused by her.

In its then condition, and for her own convenience, she manipulated the ladder in a manner contrary to its intended use. Had she not pushed the ladder forward out of alignment, it would not have slipped back and no injury would have resulted.

Having full knowledge of the defective condition of the ladder, and knowing that its use in that condition was attended with a risk likely to lead to serious consequences, she must be charged with contributory negligence in attempting to ascend it after she herself had pushed it out of its accustomed position and deprived it of its normal method of functioning. The accident was unfortunate and her injury is regrettable, but we are compelled to hold, upon each of the grounds herein assigned, that she cannot recover damages from the respondent.

The judgment is affirmed.

SIMPSON, C. J., MILLARD, JEFFERS, and MALLERY, JJ., concur.

