[No. 38811.   Department One.   May 25, 1967.]

# GERALD OLSON et al., *Respondents*, v. KING COUNTY, *Appellant*.*

\*Reported in 428 P.2d 562.

280

*Charles O. Carroll, James E. Kennedy,* and *John M. Watson,* for appellant.

*Abbott & Curtis* and *James V. Abbott,* for respondents.

HILL, J.—This is an appeal by King County from judgments against it recovered by three contiguous property owners, referred to herein as Olson, Norton, and Handley. They each brought an action against King County on three theories: (1) negligence; (2) a taking and damaging of their property in violation of art. 1, § 16 (amendment 9) of the Washington State Constitution; and (3) nuisance. The three cases were consolidated for trial; likewise for the appeal.

The plaintiffs own lakefront homes on the west side of Lake Sammamish. West of them is West Side Lake Sammamish Road with an access lane between their homes and the road. Still further west and at a considerably higher elevation is Northrup Road.

On the west side of Northrup Road and extending in a general northerly and southerly direction, lies a real estate development known as Lake Hills No. 26. The development is bordered on the east by Northrup Road, on the north by Northeast 8th Street, and on the west by 172nd Place Northeast. The property to the west and north of Lake Hills No. 26 had been developed for a number of years. Clearing, cutting, and grading work had been carried on in Lake Hills No. 26 during the summer and early fall of 1962.

The cause of the damage to the plaintiffs' properties is well expressed in the trial court's finding of fact No. 10:

That West Lake Sammamish Highway and Northrup Road intersect at a location approximately near Lot 35 of Lake Hills #26. Northrup Road extends from this point in a northerly direction, and West Lake Sammamish

Highway extends from this point in a generally northeasterly direction.

At a point some two to three hundred feet north of the intersection of Northrup Road and West Lake Sammamish State Highway, on Northrup Road, is a King County culvert under said road, referred to generally as the "No. 1" or "Olson" culvert. This culvert drained water from the storm drainage ditch on the west side of Northrup Road. The outfall of the "Olson" culvert was located just a little bit below the surface grade of Northrup Road, on the east side of said road, with the outfall virtually at the top of the shoulder of the road. That the shoulder of the road was made up of earthen fill, and the shoulder fell off to an embankment some thirty to thirty-five feet deep. The outfall of water was allowed to cascade down this earthen fill into a small ravine, thence travel in a general easterly direction down to the West Lake Sammamish State Highway where a catch basin is located. The water was then carried under the State Highway to a collection box on the east side thereof, thence through private culverts, belonging to plaintiff Olson, through his property and on to Lake Sammamish.

On November 24, 1962, an unusually heavy rainfall was experienced throughout the whole Lake Hills and Lake Sammamish area, which caused a considerable run-off. The origin of a substantial amount of water which reached the "Olson" culvert, came from areas to the north and to the west of Lake Hills #26, and approximately two blocks west and uphill of the intersection of Northeast Eighth and Northrup Road, and from the north of Northeast Eighth in an area outside of Lake Hills #26. The water flowed east on Northeast Eighth, by-passing the culvert on Northeast Eighth, because of its being clogged, and continued on south on the west side of Northrup Road. A number of King County culverts along the west side of Northrup Road which are intended to collect water from the west storm drainage ditch of Northrup Road, and discharge the water on the east side of said road, were clogged and that the water continued on its course down the west side of Northrup Road, eventually reaching the "Olson" culvert. The water then proceeded through the "Olson" culvert, falling to the east side of Northrup Road at the outfall of said culvert.

The water which flowed through the "Olson" culvert eroded the east shoulder and earthen fill embankment of

the road, causing a complete washout of said embankment and one half of King County's Northrup Road in this area. That the many hundreds of yards of material from this washout flowed through the ravine and under the West Lake Sammamish Highway culvert and erupted at the west end of "Olson's" private culvert causing debris to be cast upon all of the plaintiffs' properties.

The negligence of King County, which was the proximate cause of the damage sustained by the plaintiffs, is set forth in finding of fact No. 11:

That many years prior to 1962 King County constructed culverts under Northrup Road, including the "Olson" culvert. That the "Olson" culvert was constructed of sections of concrete pipe, without cement or grouting between said sections and that said sections of pipe were approximately 3 feet in length and 18 inches in diameter. That on the east side of Northrup Road at the outfall of the "Olson" culvert there was no splash apron or hard surface material provided to carry the water from the outfall down to the base of the slope some thirty-five feet.

That good construction practice and standard of care requires that on the outfall side of a culvert such as this that the water be in some manner carried above the fill so as not to allow the washing of rock, sand, dirt and gravel. That standard construction practice is that the water either be allowed to flow down a splash apron, or that it be carried in an enclosed pipe from the outfall of the culvert to a point below the toe of the earthen fill embankment so as to prevent the washing of any materials from said embankment. That King County failed to properly construct said culvert outfall.

That defendant . . . King County, failed to exercise the proper degree of care in the construction of the outfall area of the "Olson" culvert.

This is not a case of a culvert being unable to carry the runoff with resulting flooding. Indeed, the maximum amount of water carried by the culvert was only about two-thirds of its capacity. Had the county done what good engineering practice required—provided a splash apron or hard-surface material to carry the water from the outfall to the base of the slope—the plaintiffs would have sustained

no damage. As indicated, it was the material eroded from the embankment which caused the damage.

The plaintiffs had joined as additional defendants certain property owners, developers and contractors, who were participating in the development of Lake Hills No. 26, on the theory that they had been negligent in certain of their activities and such negligence had increased the flow of water through the No. 1 culvert; and King County had cross-complained against the same defendants.

One of the contentions of the county was that the plaintiffs had failed to segregate or apportion their damages between the county and these additional defendants.

With relation to the contribution of the defendants, other than King County, to the damages sustained by the plaintiffs, the court made the following finding of fact:

> The development of Lake Hills #26 by clearing and grading did not increase the natural flow of water beyond the natural capacity and capabilities of the storm drainage system and culverts. The storm drainage culverts and ditches did not overflow or overtop their confines and that all of the waters which came down said drainage facilities in November and December of 1962, would have continued on out to Lake Sammamish had there not been any erosion and washing away of the earthen-fill embankment on Northrup Road at the outfall side of the "Olson" culvert.

> The flow of the surface water along the natural drains may have been hastened or incidentally increased by the clearing and grading of Lake Hills #26; however, the water was not ultimately diverted from its natural flow, nor was the drainage increased beyond the capacity of the complete water course and system in its natural condition. (Finding of fact No. 16)

■ The facts, as found by the trial court, are supported by substantial evidence and justified dismissing from the case the defendants who owned or were developing property in Lake Hills No. 26. These facts support the trial court's conclusion that the county alone was responsible for the damages sustained by the plaintiffs. This disposes of the county's contention that the damages should have been segregated or apportioned.

The county's further contention that the damages were excessive is predicated upon two propositions: first, that there was no taking or damaging in violation of the constitution; and, second, that any recovery for damages occasioned by the county's negligence was limited to the amount of damages set forth in the claims which were filed against the county.

The trial court felt that under either theory, *i.e.*, a constitutional taking and damaging or the negligence of the county, the damages would be the same.

■ We see no constitutional taking or damaging in this case. Every trespass upon, or tortious damaging of real property does not become a constitutional taking or damaging simply because the trespasser or tort-feasor is the state or one of its subdivisions, such as a county or a city.

There have been two factors which have furnished some excuse for warping and torturing the results of tortious conduct into a constitutional taking or damaging of property. One, the immunity from tort liability long enjoyed by the state and its subdivisions; and, two, the failure on the part of the owners of obviously damaged property to file the claims which were conditions precedent to a tort action where such actions were permitted.

The immunity is now gone in this state; and in this particular case the claims were timely filed.

Concededly the distinction between a constitutional taking and damaging and tortious conduct by the state or one of its subdivisions is not always clear. But subsequent to the comprehensive analysis of our cases by Judge Tolman in *Wong Kee Jun v. Seattle,* 143 Wash. 479, 255 Pac. 645, 52 A.L.R. 625 (1927), supplemented by Judge Steinert's scholarly discussion in *Boitano v. Snohomish Cy.,* 11 Wn.2d 664, 120 P.2d 490 (1941), we have adhered fairly closely to the principles enunciated in those cases.

■ In the instant case, it appears that Northrup Road was constructed some time prior to 1935. The fill above the plaintiffs' properties occasioned no damage to their properties until 1962. The inundating of the properties of the

plaintiffs with rocks, dirt, silt and debris in 1962 was neither contemplated by the plan of the work, nor was it a necessary incident in the building or maintenance of the road. The damage occurred because, as the trial court found, the county negligently failed to follow the recognized standard of care to protect the fill from being eroded by the water coming through the culvert.

The present case falls into the category referred to in *Wong Kee Jun, supra*, as a "mere temporary interference with a private property right . . . such as might have been avoided by due care." The case of *Peterson v. King Cy.*, 41 Wn.2d 907, 252 P.2d 797 (1953), where due care would have prevented a slide onto the plaintiff's property, is in point. In a somewhat similar case in Idaho where the city's failure to keep a flume in repair had permitted water, sand, silt and debris to cover the plaintiff's property, there was not even a suggestion of a constitutional taking or damaging, although Idaho has a comparable constitutional provision. *Dunn v. Boise City*, 45 Ida. 362, 262 Pac. 507 (1927); 48 Ida. 550, 283 Pac. 606 (1929).

We agree with the county that the filing of claims was a prerequisite to maintaining an action against it. However, the claims were timely filed by each of the plaintiffs. Those claims described accurately and in considerable detail the character of the physical damage to their properties and what had caused it.

The county has no objection to the sufficiency of the claims as filed; the contention is that the amount of the plaintiffs' recovery is limited to the dollar damage indicated in the claims, even though the evidence demonstrated that the physical damage described in the claims amounted to more in dollars than stated in the claims.

Each of the plaintiffs was permitted to recover an amount substantially in excess of the dollar damages enumerated in the claim which he had filed.[1]

---

[1]The Olson claim stated items of dollar damages as follows:

| | | |
|---|---|---|
| "1. | 250 feet of 18″ corrugated culvert pipe | $700.00 |
| 2. | Install pipe and weld | 321.00 |
| 3. | Lake pump buried—recover and repair | 50.00 |

Olson's claim set forth dollar damages as $4,717, and he was given a judgment of $5,500; Norton's claim set forth dollar damages of $540.80, and his judgment was for $1,500; Handley's claim mentions dollar damages of only $150 (but his damages, as shown by the claim, were considerably more than that),[1] and his judgment was for $1,000. It should be noted that the Olson claim was the only one which included a depreciation in property value as an element of damage.

| | | |
|---|---|---|
| 4. | Remove debris, replace soil bulkhead | 500.00 |
| 5. | Estimate cost placing culvert underground | 400.00 |
| 6. | Personal labor 82 hrs. at $3.00 | 246.00 |
| 7. | Permanent reduction property value | 2500.00 |
| | | $4717.00" |

The damages to his property were described as follows:

"Waters washed soil from claimant's land . . . deposited soil, rock and debris over claimant's land, driveway, and beach and the lake waters adjacent. Washing threatened buildings and improvements and undermined driveway, requiring installation of large pipe and tile to protect claimant's property."

The Norton claim stated items of dollar damages as follows:

| | |
|---|---|
| "Fill & regrade driveway & parking | 100– |
| Crushed rock 8 yds ¾ minus | 60– |
| Clean & reset drains, fill washouts at house | 80– |
| Reset rockery | 25– |
| Restore lawns & flower beds | 150– |
| Fill other washouts, clean beach, haul away dirt | 105 |
| | 520.– |
| Tax | 20.80 |
| Total | $540.80" |

The damages to his property were described as follows:

"Driveways and parking areas washed out or covered with rock, sand & mud, drains for downspouts blocked or washed out of ground. Rockery partially collapsed landscaping washed out. Earth washed away from house foundations. Lawns covered by debris, beach covered with rock and mud."

The Handley claim referred to only one dollar item—$150. Anyone reading the claim must have known that Handley's damages had been far in excess of $150. The claim states that the property was left with a covering of from 4 to 6 inches of mud, stones and debris after the water ran off; also one retaining wall was completely ruined and another badly damaged; other walls and banks damaged; grass on lawns badly damaged.

We have insisted that claims against the county be timely filed in accordance with RCW 36.45.010; *Caron v. Grays Harbor Cy.*, 18 Wn.2d 397, 139 P.2d 626, 148 A.L.R. 626 (1943); *Shaw Supply Co. v. King Cy.*, 172 Wash. 137, 20 P.2d 8 (1933); that they state the place of residence of the claimant at the time and for 6 months preceding the date the damage occurred with such particularity that the county may make such investigation of the claimants as it may desire; RCW 36.45.020; *Nelson v. Dunkin*, 69 Wn.2d 726, 419 P.2d 984 (1966); *Hanford v. King Cy.*, 112 Wash. 659, 192 Pac. 1013 (1920); *Frasier v. Cowlitz Cy.*, 67 Wash. 312, 121 Pac. 459 (1912); that the claims must locate and describe the defect which caused the damage so that the county may have every opportunity to investigate; *Nelson v. Dunkin, supra; Puget Constr. Co. v. Pierce Cy.*, 64 Wn.2d 453, 392 P.2d 227 (1964); *Frasier v. Cowlitz Cy., supra;* and that the nature and extent of the damage must be clearly described; RCW 36.45.020; *Puget Constr. Co. v. Pierce Cy., supra; Hanford v. King Cy., supra.*

We have had little occasion, however, to direct our attention to the necessity of the requirement that a claim against a county "contain the amount of damages claimed" (RCW 36.45.020),[2] although we have many times, in cases involving claims against cities, recognized the right of a claimant to sue for and recover damages in excess of the dollar amount indicated in the claim.

One of our earliest cases, discussing the effect if the ultimate damages suffered were greater than those set out in the claim as filed, said:

> It is contended by the respondent that the provision of the charter requiring the claimant to state the cause, nature, and extent of his injuries, and the amount of damages sustained thereby, is an unreasonable provision, for the reason that it frequently occurs that the damages are not ascertainable within the thirty days, as in this case, where the testimony is to the effect that the plaintiff did

---

[2]One of the numerous defects in the claim held to be insufficient in *Caron v. Grays Harbor Cy., supra,* was "that it did not state the amount of damages claimed."

not know that he was permanently injured until the day he presented his claim. But we think a reasonable compliance with this provision is all that would be required, and that it is the duty of a claimant, under this charter provision, to state as near as he can the amount of his damages; and, no doubt, if it should afterwards eventuate that he had been mistaken in that regard, he would be allowed by the court to make such showing. (*Born v. Spokane*, 27 Wash. 719, 725, 68 Pac. 386 (1902))[3]

Thereafter our forecast (in *Born, supra*), of what would happen if the actual damages exceeded the amount stated in the claim, proved to be accurate. In *Pierce v. Spokane*, 59 Wash. 615, 110 Pac. 537 (1910), the plaintiff filed a claim for $5,470 (doctor $350, hospital $120, personal injuries $5,000). The claim being rejected, she commenced an action for $18,358, and received a verdict for $8,000. Judgment was entered on the verdict, and this court affirmed the judgment. We used a portion of the foregoing quotation from *Born, supra,* and then said:

The manifest purpose of the charter was to afford the city an early opportunity to examine the locality where the accident occurred, to ascertain the nature of the alleged defect in the street or sidewalk, and learn, as far as known, the character and extent of the injuries sustained by the claimant, so that it may avoid litigation and costs by settling the claim, if meritorious; or on the other hand, if on investigation the claim appeared to be without merit, then to afford the city an opportunity for preparing its defense and procuring evidence while the same may be obtained. The single circumstance that the claimant, not fully realizing the extent of her injuries, demands less, or offers to settle for less than, as shown by future developments, she should recover, will not preclude her from maintaining a suit for the damages actually sustained, and subsequently ascertained. (p. 619)

In *Smith v. Tacoma*, 163 Wash. 626, 1 P.2d 870, 75 A.L.R. 1508 (1931), the plaintiff filed a claim for $7,500 for inju-

[3]We realize that the holdings in some of our early cases are extremely liberal, if not lax, in the matter of the enforcement of charter provisions relative to claims against cities. See *Cole v. Seattle,* 64 Wash. 1, 116 Pac. 257 (1911), which calls attention to that situation and gives impetus to the tightening-up process. We have, however, used only such holdings and quotations as are sustained by present day authority.

ries, pain and suffering; and, after its rejection by the city, she brought an action for $15,000. This we held she was entitled to do, relying on *Pierce v. Spokane, supra.*[4]

While the Washington cases supporting the right to sue for and recover more than the amount of damages designated in the claim are all *personal* injury actions against cities, we regard them as controlling.

■ The provisions (statutory and charter) relative to the filing of claims against cities represent no material differences from the provisions of the county-claims statute. RCW 36.45.010 and 020. The annotation captioned: "Amount of damages named in notice of claim against municipality as limiting amount of recovery," at 75 A.L.R. 1511, states the rule as follows:

> Although there are some cases in which a contrary conclusion has been reached, it has been generally held, both under statutes providing that a notice or claim for damages must be presented to municipal authorities in order that recovery may be had and apart from such statutes, that the amount claimed in the petition or notice *does not necessarily limit or control the amount which may be recovered* in an action to enforce the claim. It will be seen that this view has been taken even under statutes which require that the notice state the amount claimed. (Italics ours.)

Claimants should be limited to the recovery of amounts actually expended within the area usually referred to as special damages, but where the extent of the damage is unknown or is an unliquidated amount at the time of the filing of the claim, any amount indicated in dollars should not be a limitation on what the trier of the facts may find the money damages to be.

While in property damage cases the claimant is more apt to know the full extent of his damages when the claim is filed than in personal injury cases, there are instances when the full extent of the damages to property are not readily apparent and where the cost of renovation and re-

---

[4]Her recovery was only $7,000 (which was reduced to $4,000).

pairs may be an unliquidated item when the claim is filed. In such cases, the recovery should not be limited to the specific dollar amount stated in the claim, if the evidence establishes dollar damage in excess of that amount.

In *Wagner v. Seattle*, 84 Wash. 275, 146 Pac. 621 (1915), the trial court permitted an amendment of the claim to include an item of $65 for nursing care, which the evidence showed had been expended at the time the claim was filed, but which was omitted therefrom. We held that there was no authority for amending a claim, and that the omitted item could not be recovered, saying:

> The provision requiring the filing of a claim being statutory in its nature, there can be no amendment without statutory authority. There is no such authority in this state, and we must hold that such claims cannot be amended at the trial so as to include items of damage known at the time of the filing of the claim but not included therein. It was, therefore, error for the lower court to permit the amendment, but it does not follow that the judgment must be reversed, since the error can be remedied by deducting from the judgment the sum of $65, the amount paid for nursing. (p. 276)

And then we added:

> We do not mean to be understood in so holding, that claims of this character must be construed with such exactness as to preclude evidence of those injuries not specifically mentioned in the claim, but which naturally and proximately flow from the injuries described in the claim. Evidence of such proximate results is admissible without reference to the claim. (p. 277)

There is a plethora of authority recognizing the right to recover damages in excess of the dollar amount stated in the claim both as to personal injuries and property damage. This is placed not only on the basis of knowledge obtained subsequent to the filing of the claim, but on the basis that where the claim has served all the purposes intended and the governmental subdivision involved has rejected it, it has thus made litigation the only recourse.

That a claimant might have been willing to settle for less than his provable damages, if the amount was paid

promptly and without litigation, should not, the claim being rejected, prevent the recovery of the damages actually sustained—*i.e.*, those damages naturally and proximately flowing from the injuries described in the claim but not liquidated at the time the claim was filed. See Annotations, 63 A.L.R.2d 863; 136 A.L.R. 1368; 106 A.L.R. 855; and 75 A.L.R. 1511.

We therefore disagree with the contention of the county that plaintiffs were limited in their recoveries to the dollar amounts stated in their claims.

Evidence was admitted of depreciated property value in behalf of all three plaintiffs, but only the plaintiff Olson included that specific item in his claim for damages.

The only case we have found bearing on the effect of a failure to file a claim for this element of damage is *Sweet v. Salt Lake City*, 43 Utah 306, 314, 134 Pac. 1167 (1913), in which an automobile had plunged into a ditch because of the city's negligence in failing to maintain adequate warning signs and lights. We quote from the opinion:

In the original claim the damages and injuries were stated in the following language:

"The damage to property and person in the sum of $245.69, as follows:

| | |
|---|---|
| Pulling car out of creek.........................$20 | 00 |
| Bill for repairing frame, seat, etc.............. 50 | 69 |
| Replacing broken lamps ...................... 30 | 00 |
| Replacing broken crank case and broken light brackets ............................. 42 | 50 |
| Necessary expenditures yet to be made for repairs 10 | 00 |
| Doctor bill for attendance upon Mrs. F. A. Sweet and Mrs. F. E. Ogle ................. 12 | 00 |
| Drug bill for medicinal articles ............... 2 | 50 |
| To value of contents of handbag containing money, watch, three gold chains, two gold bracelets, pocketbooks, etc. ................. 78 | 00" |

The other portions of the claim simply refer to the time and place of injury, and how it occurred, and in what way it was claimed appellant was negligent, with a statement that the repairs to the automobile were necessary and that the other property referred to was lost.

The claim was rejected and the claimant brought an action seeking to recover the items specifically designated in the claim and for another $1,000 for depreciation of said automobile as a result of its going into the ditch. The jury allowed $750 damages, or $504.31 in excess of the detailed damages in the claim.

The Supreme Court of Utah reversed the judgment, holding that the evidence of the depreciated value of the car should not have been admitted. The reason given was:

> The purpose of our statute is very clear, which is to require every claimant to clearly state all of the elements of his claims to the city council for allowance as a condition precedent to his right to sue the city and recover his damages in an ordinary action. That the state through its lawmaking power has an absolute right to impose such conditions all courts agree. One of the principal objects of the statute is to prevent spurious claims from being paid, and, in order to fully accomplish that purpose, to give the city officials ample opportunity to examine into both the cause and extent of the injury and also to test the good faith of the claimant in presenting the claim. In view of the form in which the claim was presented in this case, could any one suspect that a claim for $1000 for "general impairment" of the automobile could ever follow either as a proximate or remote consequence of the injuries described and complained of in the original claim? What opportunity did the city ever have to inquire into the item for $1000? None whatever. . . .
>
> . . . .
>
> By what we have said upon this question we do not wish to be understood that an injured person may not at the trial recover the actual damages sustained by him where such damages are the necessary and proximate consequences of the injuries described in the claim presented and where the injured person could not know at the time of the presentation of the claim that the injuries were serious or permanent where these latter facts are pleaded and proved. What we do hold, however, is that where the claimant seeks to recover for a different item or element of damages as in this case, he cannot do so for the reason that such item or element is not described or referred to in the original claim presented to the city council. (pp. 315, 317)

■   We agree with the Utah court that the depreciation in value is such a claim of injury as should be brought to the attention of the county, if the property owner intends to rely on it. Where the damage to real property is only temporary and the property can be restored to its original condition at a reasonable expense, the usual measure of damages is the cost of restoration and the loss of use. *Keesling v. Seattle*, 52 Wn.2d 247, 324 P.2d 806 (1958); *Burr v. Clark*, 30 Wn.2d 149, 190 P.2d 769 (1948). There is not ordinarily a depreciation in the value of real property over and above the cost of restoration, however, it does sometimes occur. *Grant v. Leith*, 67 Wn.2d 234, 407 P.2d 157 (1965). It is only in the event that the diminution in value exceeds the cost of restoration that it becomes important as an additional item of damages.

There was nothing in the Norton or Handley claims that gave any indication that they had in mind any damages based on diminution of value, and not having given notice of such an unanticipated element of damage, we hold that the evidence in support of diminution of value could not be considered in determining the damages sustained by Norton or Handley.

Coming now to the specific consideration of whether the damages in the present case are excessive, we would emphasize that the trial court's only finding on the issue as to the amount of damages was:

> That because of the deposit of dirt, rock, silt, mud and debris on the plaintiffs' properties, which have required the plaintiffs to incur expenses in cleanup, damage to shrubs, embankments, rockeries, concrete driveways, and damages to the beach, as a result of the floods of November and December of 1962, . . . . (Finding of Fact No. 19)

Olson had been damaged in the sum of $5,500; Norton in the sum of $1,500; and Handley in the sum of $1,000.

Judgments were entered accordingly. We will consider these judgments in their reverse order and apply the rule that a plaintiff is entitled to recover the damages which nat-

urally and proximately flow from the physical damages described in his claim.

With reference to the Handley damages, there was evidence of two inundations of the property—one in November and another in December, 1962 (this was also true of the Norton and Olson properties). There were water marks showing to a height of 16 to 18 inches (within an inch of coming into the living room of his home), and the residue of mud, dirt and debris around his house was 4 to 6 inches in depth. One retaining wall was washed out; another badly damaged. His yard and 35 to 40 feet of his beach were covered with mud, silt and debris. The inconveniences and hardships in connection with living on the premises under such conditions, and the expense of having the mud, dirt and silt removed plus the cost of repairs and renovation, all naturally and proximately resulted from the conditions described in the claim. We regard the trial court's award of $1,000 for the damages sustained as very reasonable.

Special damages for repairs and renovation claimed by Norton were in excess of $500, and he testified to special damages of $1,000 caused by the condition of his property as described in his claim. These items were for the most part in excess of the damages sustained by Handley, although all property owners shared certain inconveniences and difficulties inherent in the situation. The judgment of $1,500 is readily supported by the evidence.

The Olson property received the brunt of the inundation. Olson had expenses for items such as the installation of a new culvert pipe which added almost $1,500 to his damages over those incurred by Norton. Olson having filed a claim for "Permanent reduction property value 2500.00," the trial court was entitled to consider the evidence relative to a claimed depreciation in value of his property over and above the cost of restoration and repairs. He testified his property value was reduced $8,000 by the inundation; and of this he classified $3,000 as repairable damage. The trial court's finding that Olson's damages were $5,500 is within

the range of the evidence, and we cannot say that it was excessive.

While we disagree with the trial court's conclusion of law relative to an inverse condemnation, and disagree with the plaintiffs-respondents' contention that the depreciation of property values could be considered with reference to the Handley and Norton properties, we are satisfied that the depreciation of property values does not need to be relied upon to sustain the trial court's judgment in behalf of Handley and Norton. If needed, to support the Olson judgment, it is available for that purpose.

The judgments appealed from are affirmed.

ROSELLINI, HAMILTON, and HALE, JJ., and DENNEY, J. Pro Tem., concur.

