[No. 127-40739-2.   Division Two.   May 14, 1970.]

MERLE P. SONGSTAD et al., *Appellants*, v. MUNICIPALITY OF METROPOLITAN SEATTLE, *Respondent*.

*Gerald F. Collier*, for appellants.

*Guttormsen, Scholfield, Willits & Ager* and *Jack P. Scholfield*, for respondent.

PEARSON, J.—Plaintiffs Songstad, and others having an interest in certain property, appeal from a judgment entered on a jury verdict in favor of the defendant, Municipality of Metropolitan Seattle (called Metro).

The action sought to recover damages for alleged injury

to plaintiffs' real property, caused during and after the installation by defendant of the Eastside Interceptor Line, a large sewage disposal line on the east side of Lake Washington. Four theories of liability were asserted in support of plaintiffs' claim, namely, negligence, trespass, inverse condemnation, and breach of covenant. Defendants claimed contributory negligence as an affirmative defense.

The property allegedly damaged was at the foot of a slope which faced generally toward the west. Along the top of the slope was a railroad track. Metro acquired an easement for the sewer along the right-of-way of the railroad, but in order to place the line the required 40 feet from the track, the municipality had to build up the slope by adding a fill. To that end, Metro acquired a "slope easement"[1] from plaintiffs, allowing it to pile dirt on plaintiffs' property in constructing the fill to support the pipe. The fill extended down the existing slope and rested on the lower ground at the bottom of the slope.

Before the fill was constructed, the slope was stable and covered with vegetation. There was a drainage ditch at the base (toe) of the slope which carried water along the toe in a southerly direction, where it met a creek which carried off the water flowing off and out of the slope. In constructing the fill, Metro removed vegetation from the existing slope and piled large amounts of fresh earth on the slope and on the lower ground at the bottom of the slope. Engineering efforts were made to allow water to drain along the preexisting path at the toe of the slope.

The plaintiffs contended that the construction of the fill and installation of the pipe altered the existing course of water, causing their property to be flooded and the soil to become wet and marshy. The plaintiffs' version of what happened was that the defendant permitted rock and earth to wash or precipitate onto their property. This loose earth and rock clogged the drain or ditches, resulting in the flooding. This wet condition, plaintiffs allege, delayed the

---

[1]Exhibit 70. The slope easement agreement was executed January 20, 1966, after Metro had substantially completed its work.

completion of construction of a drive-in theater on the property by approximately 1 year, costing them profits and additional construction expenses.

At the trial, the testimony was conflicting as to whether or not the plaintiffs' property was flooded and marshy prior to the construction of the fill. The evidence was also sharply contradictory concerning whether or not the fill caused the flooding and wetness to plaintiffs' property, delaying the completion of the drive-in theater. There was also conflicting testimony as to whether or not the plaintiffs contributed to their damages by making a deep cut in the toe of the slope, causing a hillside spring to open.

The trial court allowed the jury to consider only one of plaintiffs' theories of liability, namely, negligence. The refusal of the court to instruct the jury on trespass and inverse condemnation are two of the principal assignments of error on appeal. The breach of covenant theory was apparently abandoned.

We shall consider the inverse condemnation theory first. In this regard, plaintiffs contended that the deposits of rock and earth on their property, which interfered with the drainage of water, rendered the property unfit for use. In rejecting this theory, the trial court determined as a matter of law that there was no unconstitutional taking of plaintiffs' property under the evidence produced.

The leading Washington cases concerning whether various types of damage constitute a taking of property or simply a tortious interference therewith are: *Wong Kee Jun v. Seattle,* 143 Wash. 479, 255 P. 645, 52 A.L.R. 625 (1927); *Boitano v. Snohomish County,* 11 Wn.2d 664, 120 P.2d 490 (1941); and *Olson v. King County,* 71 Wn.2d 279, 428 P.2d 562 (1967).

Under those decisions, an inverse condemnation has not occurred unless the damage is contemplated by the plan of work or considered to be a necessary incident of the maintenance of the property for a public purpose. Moreover, the interference with the property must be of a permanent nature.

In *Olson v. King County, supra* at 284 and 285, the Supreme Court said:

We see no constitutional taking or damaging in this case. Every trespass upon, or tortious damaging of real property does not become a constitutional taking or damaging simply because the trespasser or tort-feasor is the state or one of its subdivisions, such as a county or a city.

There have been two factors which have furnished some excuse for warping and torturing the results of tortious conduct into a constitutional taking or damaging of property. One, the immunity from tort liability long enjoyed by the state and its subdivisions; and, two, the failure on the part of the owners of obviously damaged property to file the claims which were conditions precedent to a tort action where such actions were permitted.

The immunity is now gone in this state; and in this particular case the claims were timely filed.

Concededly the distinction between a constitutional taking and damaging and tortious conduct by the state or one of its subdivisions is not always clear. But subsequent to the comprehensive analysis of our cases by Judge Tolman in *Wong Kee Jun v. Seattle*, 143 Wash. 479, 255 Pac. 645, 52 A.L.R. 625 (1927), supplemented by Judge Steinert's scholarly discussion in *Boitano v. Snohomish Cy.*, 11 Wn.2d 664, 120 P.2d 490 (1941), we have adhered fairly closely to the principles enunciated in those cases.

In the instant case, it appears that Northrup Road was constructed some time prior to 1935. The fill above the plaintiffs' properties occasioned no damage to their properties until 1962. The inundating of the properties of the plaintiffs with rocks, dirt, silt and debris in 1962 was neither contemplated by the plan of the work, nor was it a necessary incident in the building or maintenance of the road. The damage occurred because, as the trial court found, the county negligently failed to follow the recognized standard of care to protect the fill from being eroded by the water coming through the culvert.

The present case falls into the category referred to in *Wong Kee Jun, supra,* as a "mere temporary interference with a private property right . . . such as might have been avoided by due care." The case of *Peterson v. King Cy.,* 41 Wn.2d 907, 252 P.2d 797 (1953), where due care would have prevented a slide onto the plaintiff's property, is in point. In a somewhat similar case in Idaho

where the city's failure to keep a flume in repair had permitted water, sand, silt and debris to cover the plaintiff's property, there was not even a suggestion of a constitutional taking or damaging, although Idaho has a comparable constitutional provision. *Dunn v. Boise City*, 45 Ida. 362, 262 Pac. 507 (1927); 48 Ida. 550, 283 Pac. 606 (1929).

In this case, Metro had obtained the right to construct the fill by obtaining an easement to the slope and adjacent lower ground. Moreover, it worked according to a plan concerning the slope and location of the fill, as well as for the laying of the pipe (exhibit 54).

In the case of *Boitano v. Snohomish County, supra,* the court quoted from *Jorguson v. Seattle,* 80 Wash. 126, 141 P. 334 (1914) at 130 and 131:

[T]he constitution was never intended to apply to consequential or resultant damages not anticipated in, nor a part of, the plan of a public work. It was never intended to apply to damages resulting to private property from the negligent or wrongful use of public property. As to such damages, tortious in their very inception, the injured person is remitted to his remedy on the case, as in other cases of tortious taking or injury.

We believe this case involves at most a tortious injury to property. The alleged damages were not contemplated in the plan of construction, nor were they necessarily incident to the construction work performed by Metro. Most of plaintiffs' testimony was addressed to showing that Metro was negligent in the manner in which it constructed and maintained the fill. Several possibilities were advanced as to how the damage could have been avoided or lessened. Among those possibilities were the construction of a wall at the toe of the slope; extensive sodding, seeding or planting of the slope itself; and the construction of a deep drainage ditch or berm at the top of the slope, to allow water to run along the top, rather than drain down the face of the slope. Some of these steps were eventually taken, but according to plaintiffs' contentions, they were either too late or too little to avoid the injury.

Likewise, there was no proof that damages were permanent in nature. The testimony at most showed a temporary interference with the ability of plaintiffs to complete their construction project. No qualified experts were called to testify as to permanent damage. We find no error in the refusal of the trial court to instruct the jury on an inverse condemnation theory.

We next address ourselves to the refusal of the trial court to instruct the jury on plaintiffs' theory of trespass. The plaintiffs requested and the court refused to give instruction No. 2, which states:

Ownership of property necessarily implies the right to exclusive use and enjoyment, and any unauthorized use of the adjoining premises which results in a trespass renders the trespasser liable for resulting damage to the adjoining property owner. If one of two adjoining owners wishes to raise the grade of his lot, he must build a wall on his own ground, or in some other way, keep the dirt within his own line. He cannot so fill up his own lot so as to let earth pass over his line onto the lot of his neighbor.

The plaintiffs presented witnesses who testified that the defendants placed earth outside the area of the slope easement, which would ordinarily justify a trespass instruction. However, those witnesses called to testify on this issue had observed that action prior to the execution of the slope easement agreement in January of 1966. Many photographs were admitted from which witnesses identified fresh earth, purportedly outside the slope easement area. Such photographs, however, were taken in late 1965 and prior to the execution of the slope easement agreement. The legal description for the slope easement agreement was approved by plaintiffs' engineers and we think Metro had a right to assume that it sufficiently covered the area needed for the work which had already been completed by January, 1966. *See MacKenzie-Richardson, Inc. v. Allert,* 45 Wn.2d 1, 272 P.2d 146 (1954).

There was testimony from which the jury might conclude that subsequent to the execution of the slope easement agreement dirt and rock were precipitated upon

plaintiffs' property by the process of erosion or gravity. This was the basis for the negligence instruction given by the court. We note also that instruction No. 4 submitted plaintiffs' theory of damage from "erosion and sloughing," albeit in terms of the failure of defendant in taking proper precautions against that eventuality.

The Supreme Court in *Zimmer v. Stephenson*, 66 Wn.2d 477, 403 P.2d 343 (1965) was required to differentiate between actions characterized as "trespass" and those characterized as "trespass on the case" in order to determine whether the 3-year or 2-year statute of limitations applied. In that case, the plaintiff alleged that his wheat caught fire and that the fire was caused by a spark or piece of burning carbon cast onto his property from the exhaust stack of defendant's caterpillar, which was not properly equipped with a spark arrester. Under RCW 4.16.080(1) an action for "trespass upon real property" must be brought within 3 years, while RCW 4.16.130 provided a 2-year statute of limitations for actions not otherwise provided for.

In holding that the 3-year statute of limitations applied, the court concluded that plaintiff alleged an action for "negligent trespass."

The court stated at page 481:

The actions of trespass and trespass on the case have been, during the era of their use, regarded as concurrent remedies, where they approach the dividing line so closely as to scarcely be distinguishable.

The court further states at page 482:

The action of the defendant, as alleged by plaintiff, would, if found to be negligent, constitute the immediate and direct cause of the injury claimed. The merits of the action would be the same under either form of action. No sound reason exists to search for a technical distinction.

. . . The direct-indirect distinction between trespass and case is "now rejected by most courts, and would appear to be slowly on its way to oblivion." Prosser, Torts § 13, p. 66 (3d ed.). Restatement, Torts §§ 158, 165 has abandoned the distinction, and now regards any tortious intrusion of foreign matter onto the property of another as a trespass.

While the Restatement (Second) of Torts §§ 158 and 165 (1965) does abandon the distinction between trespass and case, designating all intrusions of foreign matter as "trespass," at the same time it classifies the types of intrusions by whether they are *intentional* intrusions (Section 158) or intrusions which are caused *recklessly* or *negligently* or as a result of *abnormally dangerous activity*. (Section 165.) The latter section states at page 300:

> One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest.

Section 158 states at page 277:

> One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally
> (a) enters land in the possession of the other, or causes a thing or a third person to do so, or
> (b) remains on the land, or
> (c) fails to remove from the land a thing which he is under a duty to remove.

Section 158, comment (i) at 278 and 279 provides:

In order that there may be a trespass under the rule stated in this Section, it is not necessary that the foreign matter should be thrown directly and immediately upon the other's land. *It is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter.* Thus one who so piles sand close to his boundary that by force of gravity alone it slides down onto his neighbor's land, or who so builds an embankment that during ordinary rainfalls the dirt from it is washed upon adjacent lands, becomes a trespasser on the other's land.

(Italics ours.)

The following analysis of this question appears in 1 F.

Harper and F. James, The Law of Torts, § 1.4 (1956) at 11 and 12:

The conduct which today forms the basis of liability for the invasion of the interest in the exclusive possession of land may be of three general types: (1) conduct intended to cause an intrusion upon the plaintiff's premises; (2) conduct which, although not intended to cause an intrusion on the premises of another, is negligent with respect to the landowner's interest in the exclusive possession of his land; and (3) conduct which, although neither intended to cause an intrusion of another's premises nor negligent with respect to his interest therein in the sense that it creates unreasonable risks of such an intrusion, nevertheless creates such grave risks that it falls within that class of conduct which the law regards as "extra-hazardous" and therefore predicates thereon a liability which is described as "strict" or "absolute" liability.

While under the old procedure the action of trespass quare clausum fregit was the appropriate remedy for all these invasions of the interest in the exclusive possession of land, the second type of invasion is now governed by the general principles of negligence and the third is thought of as included in the principles governing extra-hazardous conduct, leaving only the first type of invasion as constituting the modern tort of "trespass" upon land.

At first blush, this statement may seem inconsistent with comment (i) of the Restatement quoted above. However, the requirement that the act is done "with knowledge that it will to a substantial certainty result in the entry of the foreign matter" seems consistent with "conduct intended to cause an intrusion upon the plaintiff's premises" so as to equate the two analyses.

■ We believe that no prejudicial error resulted by the refusal of the trial court to give plaintiffs' proposed trespass instruction for the following reasons:

(1) Under the rationale of *Zimmer*, we believe that the merits of the action would be reached under either trespass or negligence.

(2) Under the rationale of *Zimmer*, the action here would be better categorized as a *negligent* rather than *in-*

*tentional* intrusion onto plaintiffs' property, so that the negligence instructions in fact reached the merits of the case.

(3) Assuming arguendo that the evidence was sufficient to support the type of "intentional intrusion" referred to in Restatement (Second) of Torts § 158 comment (i) (1965) quoted above, we do not believe that plaintiffs' proposed instruction correctly stated the law, in that it omitted the requirement that the act be done "with knowledge that it will to a substantial certainty result in the entry of the foreign matter." Accordingly, the court was justified in refusing the instruction. *See Rickert v. Geppert*, 72 Wn.2d 1040, 432 P.2d 645 (1967).

Several of plaintiffs' assignments of error relate to the refusal of the trial court to instruct the jury on the issue of permanent damage to their land. The trial court had rejected the only offered testimony relating to permanent damage and we must determine whether or not that exclusion was proper.

Plaintiffs sought through Mr. Hoefer, a real estate appraiser, to establish a permanent impairment of the market value because of an alleged "continual threat of subsequent invasions."

Where there is permanent damage to real property which cannot be restored, the measure of damages includes the loss in market value to the extent that depreciation thereof exceeds the cost of restoration. *Olson v. King County*, 71 Wn.2d 279, 428 P.2d 562 (1967).

The trial court excluded the offered testimony for two reasons: (1) because permanent damages had not been pleaded, and (2) because of Mr. Hoefer's lack of qualifications. The trial court believed that whether or not there was a risk of future "invasions" was an engineering question on which the witness lacked expertise.

■ The matter of qualifications of an expert witness falls within the sound discretion of the trial court. *State v. Tatum*, 58 Wn.2d 73, 360 P.2d 754 (1961). We see no abuse of discretion on either of the grounds mentioned.

■ The court did allow: (1) testimony as to the net

cash flow profit of the theater during the year it could not open; (2) testimony of the rental value of the land during the year when construction was delayed; and (3) testimony as to the cost of repairing and restoring the property as well as the additional cost of construction resulting from the claimed interference. The court likewise instructed the jury on the proper measure of damage (absent proof of permanent damages), namely, the cost of restoration, together with the loss of use. *Colella v. King County*, 72 Wn.2d 386, 433 P.2d 154 (1967).

We find no error in the court's instructions concerning damages.

In the court's instruction No. 10, the jury was told:

> You are instructed as a matter of law that the defendant in this case had a legal right in constructing the sewer line involved to remove any and all natural vegetation along the railroad right-of-way, and from the areas acquired from the plaintiffs by the slope easement agreement.

The plaintiffs have assigned error to the giving of the instruction on the basis that it takes from the jury a question of fact, *i.e.* whether it was negligence to remove vegetation from the right-of-way and easement. In their assignment, plaintiffs seem to be contending that there was substantial evidence that the Metro was negligent in removing vegetation, thereby causing injury to plaintiffs' property. However, our examination of the record discloses no substantial evidence of negligence by Metro in clearing vegetation from the right-of-way and easement areas, and appellant has not cited us to portions of the record disclosing such evidence. There is substantial testimony to the effect that clearing vegetation was a necessary and expected element of constructing the fill and laying the pipe. In the absence of sufficient evidence of negligence in removal of vegetation, it was not prejudicial error to give instruction No. 10. *Lofgren v. Western Washington Corp. of*

*Seventh Day Adventists,* 65 Wn.2d 144, 396 P.2d 139 (1964).

Judgment is affirmed.

ARMSTRONG, C. J., and PETRIE, J., concur.