PANDE CAMERON AND COMPANY
OF SEATTLE, INC., et al.,
Plaintiff,

v.

CENTRAL PUGET SOUND REGION-
AL TRANSIT AUTHORITY (Sound
Transit), et al., Defendants.

Case No. 07–cv–1312–JPD.

United States District Court,
W.D. Washington,
at Seattle.

March 20, 2009.

James J. Klauser, Robert C. Rowley, Rowley & Klauser, Michael E. Withey, Law Office of Mike Withey, Seattle, WA, for Plaintiff.

Matthew J. Segal, Paul J. Lawrence, Sarah C. Johnson, K & L Gates LLP, David Nelson Bruce, Duffy J. Graham, Savitt & Bruce LLP, Seattle, WA, for Defendants.

## ORDER REGARDING PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

JAMES P. DONOHUE, United States Magistrate Judge.

## I. INTRODUCTION AND SUMMARY CONCLUSION

This matter comes before the Court on the parties' cross-motions for summary judgment. Dkt. Nos. 38, 45, 50. After careful consideration of the motions, the oppositions and the reply briefs, the supporting materials, the governing law, oral argument of counsel, and the balance of the record, Defendant Sound Transit's motion for summary judgment, Dkt. No. 38, is GRANTED, Defendant City of Seattle's motion for summary judgment, Dkt. No. 45, is GRANTED, and Plaintiffs' joint motion for summary judgment, Dkt. No. 50, is DENIED.

## II. FACTS AND PROCEDURAL HISTORY

### A. Background of the Stub Tunnel Project

In 1996, the Washington State voters in the Central Puget Sound area, which includes King, Pierce, and Snohomish Counties, approved financing for the ten-year *Sound Move* regional transit system plan. The Central Link Light Rail Project, a major element of the *Sound Move* plan, is a 23.4–mile light rail line connecting the Northgate Urban Center, the University District, downtown Seattle, southeast Seattle, the city of Tukwila and the Seattle–Tacoma International Airport. Defendant Central Puget Sound Regional Transit Authority ("Sound Transit") is responsible for building the Central Link Light Rail Project.

As part of the construction of the initial segment of the light rail line, Sound Transit conducted certain retrofit work on Seattle's existing downtown transit tunnel. Part of the retrofit work included the construction of a "stub tunnel," which is a tunnel segment connected to the existing downtown transit tunnel and extending several blocks along Pine Street between Eighth Avenue and Interstate 5. The stub tunnel was constructed to allow light rail trains to stop and change direction and, additionally, it serves as the point at which the north link light rail segment will join with the downtown transit tunnel. The location of the stub tunnel was determined by Sound Transit upon consideration of a variety of light rail alignment alternatives and pursuant to an environmental review process.

### B. Environmental Review and Approval of the Light Rail Project

In 1999, Sound Transit completed the Environmental Impact Statement ("EIS") for the Central Link Light Rail Project, including the construction of the stub tunnel. The EIS was prepared under both the National Environmental Policy Act ("NEPA") and the State Environmental Policy Act ("SEPA"). By its Record of Decision ("ROD") dated January 5, 2000, the Federal Transit Administration

1294

("FTA") determined that the requirements of NEPA had been satisfied for construction of the light rail line. Dkt. No. 42, ¶ 3; Dkt. No. 47, Exh. G. Sound Transit later conducted a supplemental environmental review and, among other things, further examined the potential impacts and mitigation measures of the Pine Street stub tunnel's construction. Dkt. No. 42, ¶ 4. The FTA issued an Amended ROD in May 2002, which found that Sound Transit's environmental review satisfied the requirements of NEPA. *Id.*; Dkt. No. 47, Exh. H. The Amended ROD included measures to mitigate noise, vibration, air quality, and to reduce impacts to local businesses during construction of the entire light rail line. *Id.,* Dkt. No. 47, Exh. H, Att. E.

### C. *Overview of the Permitting Process for the Stub Tunnel's Construction*

In June 2000, the Seattle City Council passed Ordinance 119975, which authorized the City of Seattle to enter into an agreement with Sound Transit for the non-exclusive use of certain City of Seattle streets and rights-of-way for the light rail construction project ("Transitway Agreement"). Dkt. No. 40, ¶ 3; Dkt. No. 47, Exh. K. The Transitway Agreement required that any construction in the public right-of-way be subject to permitting and oversight by the Seattle Department of Transportation ("SDOT"). *Id.*

Sound Transit obtained two construction permits from SDOT for the stub tunnel construction that occurred in the public right-of-way. Dkt. No. 40, ¶ 4. These permits are known as Project Construction Permits ("PCPs"). The first PCP (Y1429) authorized use of the right-of-way for utility relocation work and the second PCP (Y4495) authorized construction of the stub tunnel in the public right-of-way. *Id.* Sound Transit also applied for and received three Master Use Permits ("MUPs") from the City's Department of Planning and Development ("DPD") to

cover the three staging areas to be used for the construction of the stub tunnel. *Id.,* ¶ 5. A staging area is typically used during construction for storage of materials, access to the construction site, and parking and operating of construction vehicles. Dkt. No. 47, Exh. A. The three staging areas for the stub tunnel's construction were located: (1) on the north side of Pine Street east of Eighth Avenue; (2) within the Convention Place Station, on the north side of Pine Street across from the Paramount Theater; and (3) south of Pine Street and east of the Paramount Theater. *Id.*

Plaintiff Pande Cameron and Company of Seattle, Inc. ("Pande Cameron") and other affected businesses (known as the "Pine Street Stakeholders") appealed the DPD's decision to issue the MUPs. Dkt. No. 40, ¶ 6. After a multi-day hearing, the Hearing Examiner approved the DPD's issuance of the MUPs based on the construction impact mitigation measures provided in the environmental documents. *Id.* The Pine Street Stakeholders did not appeal the decision. *Id.*

The permits issued by the City of Seattle for the stub tunnel's construction included construction impact mitigation measures from the FTA's ROD and Amended ROD, which contained the mitigation provisions developed through the environmental review and approval process, applicable City of Seattle ordinances, including City Ordinance 119975, provisions within the Seattle Municipal Code, and technical requirements that emerged during the City's review of Sound Transit's construction plan. Dkt. No. 47, Exhs. A, C.

### D. *Timeline of the Stub Tunnel's Construction*

The Pine Street stub tunnel's construction began in April 2004. The first phase involved relocating public utilities that

were located in and around the public right-of-way on Pine Street, and that phase lasted until approximately September 2004. Dkt. No. 43, ¶ 5. Sound Transit then began preparatory work for the stub tunnel construction project. *Id.,* ¶ 7. Major construction operations related to the stub tunnel were shut down between Thanksgiving 2004 and New Year's Day 2005. *Id.* In January 2005, Sound Transit began the construction work on the stub tunnel, which continued until the stub tunnel's completion in May 2007. *Id.,* ¶ 8. The stub tunnel was constructed using the "cut-and-cover" method of tunnel construction, which, simply put, involves excavating a large trench which is then enclosed and the road surface is restored.

### E. *Plaintiffs Pande Cameron and the Andonians*

Plaintiff Pande Cameron is a retail business that has been selling high-end Oriental floor coverings since its founding in Seattle in 1928. Pande Cameron was located at 815 Pine Street in downtown Seattle from 1966 through January 2005. The three Andonian brothers—Plaintiffs Paul, Gregory, and Charles ("the Andonians")—were all partial owners of Pande Cameron at one time, but as of 2000, only one of the three brothers, Charles, and his adult son, Bradley, own Pande Cameron. The Andonians acquired both the Pande Cameron store and the 815 Pine Street property many years ago when their parents retired from the business.

### F. *The Pine Street Property*

Prior to its sale, the Andonians owned the property located at 815 Pine Street as tenants in common. During the relevant period, the building on the property ("the Pande Cameron building") was occupied by two tenants, Pande Cameron and the Woodside/Braseth art gallery. The Woodside/Braseth art gallery was established in 1961 and sells high-quality contemporary works of art from Northwest artists. Pande Cameron occupied the ground floor of the building, and the Woodside/Braseth art gallery occupied the second floor.

The Pine Street property is located at the southeast corner of Pine Street and Ninth Avenue in downtown Seattle. Across Ninth Avenue to the east is the historic Paramount Theater, and to the west of the Pine Street property is the Tower 801 apartment building (which is located at 801 Pine Street at the corner of Pine Street and Eighth Avenue). Immediately behind the (now former) Pande Cameron building is a parking lot that was used by the customers of Pande Cameron and the Woodside/Braseth gallery. The parking lot was part of the Pine Street property and owned by the Andonians. Behind the parking lot is the Washington State Convention and Trade Center. Between the former Pande Cameron building and the Tower 801 apartment building is an alley that was used to enter Pande Cameron's loading area and Tower 801's resident parking garage.

Pande Cameron's most recent lease with the Andonians was a four-year lease agreement dated June 26, 1999. Dkt. No. 39, Exh. B. The lease included an option to extend the lease for five years. *Id.* In June 2003, Greg and Paul Andonian sent a letter to Charles Andonian, stating that they believed the lease was invalid, and asking that Pande Cameron execute a new lease, which would have increased the rental amount. *Id.,* Exh. C. However, Charles Andonian, on behalf of Pande Cameron, refused to sign the new lease, and Pande Cameron continued to occupy the Pine Street property under the terms of the 1999 lease.

### G. *Pande Cameron Vacates the Pine Street Property.*

Pande Cameron was located at the Pine Street property during stub tunnel-related

construction from April 2004 through January 2005. Dkt. No. 39, Exhs. P, R. In 2003, prior to the start of the stub tunnel's construction, Pande Cameron decided to leave the Pine Street location because of the stub tunnel's impending construction. Dkt. No. 39, Exh. R. Accordingly, in April 2004, Charles Andonian made an offer to buy the building at Pande Cameron's current location, which is 333 Westlake Avenue. Dkt. No. 39, Exh. T. The purchase of the Westlake building closed in July 2004. *Id.* Pande Cameron moved its business to the Westlake building at the end of January 2005. Dkt. No. 39, Exh. R.

On February 15, 2005, after Pande Cameron vacated the Pine Street property, the Andonians entered into an agreement with Diamond Parking to rent spaces located in the parking lot on the Pine Street property. Dkt. No. 39, Exh. Q. Charles Andonian testified that he received some telephone calls expressing interest about renting the Pande Cameron building on a temporary basis or after the stub tunnel construction was completed, and he inquired if Sound Transit could use the building for staging during the stub tunnel's construction. Dkt. No. 39, Exh. T. Charles Andonian did state that he believed the Pande Cameron building could have been used for warehousing during the construction of the stub tunnel. *Id.*

After Pande Cameron left the Pine Street property, Sound Transit conducted the stub tunnel construction differently and did not continue the same mitigation measures it used when there were tenants in the building. Dkt. No. 60, ¶ 4. For example, Sound Transit changed the way the concrete sidewalk and other infrastructure around the Pine Street property was removed and replaced, and changed where Sound Transit placed certain barriers, fences, signs, and temporary utilities. *Id.* After Pande Cameron moved, Sound Transit was not aware of any attempts by the

Andonians to lease the building, and in the spring of 2006 Sound Transit learned that the Andonians had obtained a permit to demolish the building. *Id.* In addition, notwithstanding Sound Transit's changes to the construction plans, neither the Andonians nor Pande Cameron contacted or complained to Sound Transit about the stub tunnel's construction after Pande Cameron left the building. *Id.*, ¶ 5. Charles Andonian testified that he did not have any contact with Sound Transit after Pande Cameron left the building. Dkt. No. 59, Exh. J. While Charles Andonian did contact the City of Seattle after Pande Cameron moved, that was regarding an unrelated sewer line incident. *Id.* If the Andonians had requested that Sound Transit maintain access to the Pine Street property as when Pande Cameron was in the building, Sound Transit would have done so. Dkt. No. 60, ¶ 5.

## H. *The Andonians Sell the Pine Street Property.*

The Andonians made efforts to sell the Pine Street property after Pande Cameron vacated the building at the end of January 2005. The Andonians received their first offer on the property in May 2005, for $5.85 million, which was rejected. The Andonians formally listed the Pine Street property on the market with an agent in June 2005. Dkt. No. 39, Exh. T. Over the next 12 months, the Andonians received several offers on the property. On March 30, 2006, the Andonians obtained a permit from the City of Seattle to demolish the Pande Cameron building.

On December 29, 2006, the Andonians signed an $8.6 million purchase and sale agreement with Security Properties, Inc. for the Pine Street property. Dkt. No. 39, Exh. J. The sale required that the Andonians demolish the Pande Cameron building (which eventually took place in early 2007).

*Id.* The sale to Security Properties, Inc. eventually closed in September 2007 for a total of $9.1 million, which was over $3 million more than the first offer on the property that the Andonians received in May 2005. Dkt. No. 39, Exh. P. From the sale price, the Andonians received $8.8 million and Pande Cameron received $300,000. *Id.* At least in part, the value of the Pine Street property increased since Pande Cameron's departure in January 2005 because of new zoning rules passed by the City of Seattle in the spring of 2006 which repealed height limits previously set on downtown buildings. *See* Seattle, Wash., Ordinance 122054 (Apr. 12, 2006).

## I. *Plaintiffs' Allegations Regarding the Stub Tunnel's Construction*

Defendants never physically took or appropriated any portion of the Pine Street property during the stub tunnel's construction. Dkt. No. 39, Exh. P. However, Plaintiffs raise a variety of allegations concerning the construction of the stub tunnel which they assert constituted an unconstitutional "taking" of their property. Plaintiffs point to "closed or blocked lanes of travel" on Pine Street, Eighth Avenue, Ninth Avenue, and the alley between the Pande Cameron building and the Tower 801 apartment building. Plaintiffs submit Sound Transit's "Daily Inspection Reports" regarding the stub tunnel's construction which refer to intermittent closures of the eastbound lane on Pine Street. Dkt. No. 51, Exh. 10. In addition, Bradley Andonian testified, for example, that there was "a lot of disruption as far as streets being reorganized and coned," "a lot of traffic tie-ups because streets got backed up," "times [when] people were unable to take a turn onto 9th Avenue and get into our parking lot," and "times when they closed eastbound Pine at 8th Avenue...." Dkt. No. 51, Exh. 11. Bradley Andonian also testified that "at times it was challenging for us to get across into the alley or get out of the alley," and that "we had customers who ... couldn't get to the parking lot." *Id.* However, Charles Andonian testified that the Pande Cameron parking lot was never fenced shut during construction and that "there was always— it had open access." Dkt. No. 59, Exh. G. In addition, Gregory Andonian testified that there was never a time that he went to the Pine Street property and could not get access to the parking lot. Dkt. No. 39, Exh. S. The record indicates that if a customer had any difficulty accessing Pande Cameron's parking lot, it was due to a portion of Ninth Avenue (which is a one-way street) being occasionally blocked or closed to vehicle traffic during construction activities. Dkt. No. 39, Exh. R; *see also* Dkt. No. 60, ¶ 6. Bradley Andonian testified that he could not identify any customers who Pande Cameron lost or that would not come into the Pande Cameron store during the stub tunnel's construction, but that he could "just recall people having trouble getting in." Dkt. No. 59, Exh. H. Charles Andonian also agreed that the traffic disruptions were not constant but "a series of individual incidents, a truck is blocking the way or a flagman is misdirecting traffic, those type of things" and he could not recall if all three lanes of Pine Street in front of Pande Cameron were ever closed at the same time. Dkt. No. 39, Exh. P.

Plaintiffs also object to the construction barricades that were set up near the Pande Cameron store. Bradley Andonian testified, "they put a 'sidewalk closed' sign up" and that "at times, you know, well, they took the sidewalk out all the way to the building." Dkt. No. 51, Exh. 11. However, Bradley Andonian acknowledged that this only happened after Pande Cameron had moved out of the building. Dkt. No. 51, Exh. 11. Also, Bradley Andonian testified that customers could always access Pande Cameron's front door on Pine

Street, but that customers walking to the store from Ninth Avenue south of Pine Street (*e.g.*, customers who had parked in Pande Cameron's parking lot), when a portion of the sidewalk was occasionally closed, would need to go around the block (*i.e.*, would need to head south on Ninth, turn right on Pike, right on Eighth, and right on Pine) to get to the front door of Pande Cameron. Dkt. No. 39, Exh. R. Charles Andonian could not recall how long this lasted, only that it was a matter of "weeks." Dkt. No. 59, Exh. G. Bradley Andonian testified that there was never a time while Pande Cameron was located at 815 Pine Street during the stub tunnel's construction that employees or customers could not physically access the building. Dkt. No. 39, Exh. R; *see also* Dkt. No. 60, ¶ 6 ("At no time was Pande Cameron denied access to either the parking lot or the Pine Street Property.").

Plaintiffs also take issue with the parking of large construction vehicles, such as earth-moving equipment and trucks, near the Pande Cameron building during the stub tunnel's construction. They cite a Daily Inspection Report that that lists several construction vehicles which Plaintiffs assert were "the kinds of equipment present at the staging areas and in the streets every day." Dkt. No. 51, Exh. 10.

Plaintiffs also protest the amount of noise created by the stub tunnel's construction. They cite several Daily Inspection Reports that include noise level readings that Plaintiffs claim "approach or at times exceed the allowable [levels]." *Id.* Charles Andonian testified that "the noise was unbearable," "I think the decibels were probably off the chart," and "we could not hear a conversation." *Id.*, Exh. 16. Bradley Andonian testified that "you couldn't hear the phone ring" and that it was "unbelievably loud and dusty ... as loud as an airplane flying over head at times." *Id.*, Exh. 11. In addition, John

Braseth, the owner of the Woodside/Braseth art gallery, stated that the noise from the stub tunnel's construction "made it impossible to talk or hear conversations." Dkt. No. 52, ¶ 5.

Plaintiffs also take exception to the vibrations and dust generated by stub tunnel-related construction activities. They refer to the EIS which "clearly contemplated" "Vibration Impacts." Bradley Andonian testified that "the building would shake a lot during a lot of the real grinding construction" and "they had a pile driver that ... shook the building like an earthquake." Dkt. No. 51, Exh. 11. He also testified that "[i]t was obviously dirty and dusty," "dust was everywhere," and it was "very noisy and dirty." *Id.*

Plaintiffs also assert that the stub tunnel's construction caused Pande Cameron and the Woodside/Braseth art gallery to relocate, and that it was impossible for the Andonians to find suitable tenants to occupy the building once it was vacated.

## J. *Plaintiffs' Photographs of the Stub Tunnel's Construction*

In support of their claims, Plaintiffs also submit numerous photographs (albeit unauthenticated) taken during the stub tunnel's construction. *See* Dkt. No. 50. The photos primarily depict various angles of the Pande Cameron building (although in some photos the building is not shown), including shots of a range of construction activities, equipment, vehicles, and barricades around or near the Pine Street property. *Id.* Four of the photos are labelled as having been taken in 2004, nine are labelled as having been taken in 2005, eleven are labelled as having been taken in 2006, and two are labelled as having been taken in 2007. *Id.* Other than the four photos taken in 2004, all of the photos appear to have been taken after Pande

Cameron moved out of the building at the end of January 2005. *Id.*

With respect to the four photos taken in 2004, they each depict construction activities on the Pine Street right-of-way—there is no indication that the sidewalk in front of the Pande Cameron store is blocked or closed. *Id.* In fact, in two of the photos from 2004, the Pande Cameron building is not shown. *Id.* Regarding the photos taken in 2005, several of the photos reveal that the sidewalk in front of the Pande Cameron building (then vacant) was open, at least when the photo was taken. *Id.* However, in most of the photos taken in 2006, the sidewalk surrounding the Pande Cameron building appears to be at least partially blocked, closed, or removed. *Id.* The two photos taken in 2007 appear to show the stub tunnel's excavation and "covering," but do not show the Pande Cameron building. *Id.*

## III. JURISDICTION

Pursuant to 28 U.S.C. § 636(c), the parties have consented to having this matter heard by the undersigned United States Magistrate Judge. Dkt. No. 8. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b).

## IV. DISCUSSION

### A. *Summary Judgment Standard*

"Claims lacking merit may be dealt with through summary judgment under Rule 56" of the Federal Rules of Civil Procedure. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is "genuine" if it constitutes evidence with which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). That genuine issue of fact is "material" if it "might effect the outcome of the suit under the governing law." *Id.*

■ When applying these standards, the Court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *See United States v. Johnson Controls, Inc.,* 457 F.3d 1009, 1013 (9th Cir. 2006). The moving party can carry its initial burden by producing evidence that negates an essential element of the nonmoving party's claim, or by establishing that the nonmoving party does not have enough evidence of an essential element to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000).

■ Once this has occurred, the procedural burden shifts to the party opposing summary judgment, who must go beyond the pleadings and affirmatively establish a genuine issue on the merits of the case. Fed.R.Civ.P. 56(e). The nonmovant must do more than simply deny the veracity of everything offered by the moving party or show a mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The mere existence of a scintilla of evidence in support of the plaintiff's position is likewise insufficient to create a genuine factual dispute. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. To avoid summary judgment, the nonmoving party must, in the words of Rule 56, "set forth specific

facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party's failure of proof concerning an essential element of its case necessarily "renders all other facts immaterial," creating no genuine issue of fact and thereby entitling the moving party to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**B. *Applicable Law***

Plaintiffs bring their inverse condemnation and substantive due process claims under the United States Constitution and the Washington State Constitution. The Fifth Amendment to the United States Constitution provides that private property shall not be taken for public use without just compensation. U.S. Const. amend. V. That constitutional right is binding upon the states through the Fourteenth Amendment to the United States Constitution. *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 311 n. 4, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The Fourteenth Amendment also provides that no state shall deprive any person of property without due process of law. U.S. Const. amend. XIV. The Washington State Constitution provides that private property shall not be taken or damaged for public or private use without just compensation, Wash. Const. art. I, § 16, and that no person shall be deprived of property without due process of law, Wash. Const. art. I, § 3.

■ The inquiry concerning Plaintiffs' inverse condemnation and substantive due process claims begins with the law of Washington State because whether a property right exists is generally determined by state law. *See United States v. Cress,* 243 U.S. 316, 319, 37 S.Ct. 380, 61 L.Ed. 746 (1917); *Federal Power Comm'n v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 252, 74 S.Ct. 487, 98 L.Ed. 666 (1954);

*Boone v. Redevelopment Agency of San Jose,* 841 F.2d 886, 893 (9th Cir.1988). However, the applicable law with respect to Plaintiffs' 42 U.S.C. § 1983 claim is federal law, because § 1983 is "a method for vindicating federal rights" conferred by the United States Constitution and federal statutes. *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

**C. *Plaintiffs' Inverse Condemnation Claim***

■ Plaintiffs' first claim for relief is one for inverse condemnation. The term "inverse condemnation" is used to describe an action alleging a governmental "taking," brought to recover the value of private property which has been appropriated in fact by the government, but with no formal exercise of the power of eminent domain. *Phillips v. King County,* 136 Wash.2d 946, 957, 968 P.2d 871 (Wash.1998). In Washington, a party alleging inverse condemnation must establish the following elements: (1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings. *Id.*

■ An inverse condemnation plaintiff must prove a government "taking" of property greater than "a mere tortious interference." *Gaines v. Pierce County,* 66 Wash.App. 715, 725, 834 P.2d 631 (Wash. Ct.App.1992). That is, an inverse condemnation theory of recovery, which is premised on a "taking" of private property by the government, is distinct from, and an alternative to, a tort theory, such as nuisance or trespass. Among other differences, the damages available under tort and taking theories are different, and often tort remedies against the government are barred by principles of sovereign immunity. However, that is not the case in Wash-

ington. *See* R.C.W. § 4.96.010 ("All local governmental entities, whether acting in a governmental or proprietary capacity, shall be liable for damages arising out of their tortious conduct ... to the same extent as if they were a private person or corporation."); *Olson v. King County*, 71 Wash.2d 279, 284, 428 P.2d 562 (Wash. 1967) (noting that sovereign immunity and tort claims-filing provisions "have furnished some excuse for warping and torturing the results of tortious conduct into a constitutional taking" but that "immunity is now gone in this state").

The distinction between a constitutional taking claim and a tort claim such as nuisance, however elusive it may appear to be, is important not only because of issues related to, for example, damages and sovereign immunity, but because it is reasonable to require a greater degree of interference with a property right before there is a finding that the government violated the constitution, as opposed to a finding that the government violated statutory or common law nuisance principles. *See* Carlos A. Ball, *The Curious Intersection of Nuisance and Takings Law*, 86 B.U. L.REV. 819, 858 (2006). In addition, modern society

> charge[s] government with the duty to carry out certain functions (for example, the operating of landfills, sewage treatment plants, and airports) that are likely to impose some harms on nearby [property] owners. If the government were liable under a takings theory to the same extent that a private owner would be liable under nuisance doctrine, it would present significant challenges to the government's ability to effectively carry out its functions. For this reason, it makes sense to require a greater magnitude of harm to make out a takings claim than a private nuisance claim.

*Id.* Consequently, the government, because of its unique responsibility to promote the public welfare and common good (such as, for example, by building a light rail transit system in a densely populated urban area), "must have a greater ability than private land owners to interfere with the use and enjoyment of property before liability attaches." *Id.* at 856.

Of course, Washington case law recognizes that a governmental tort may, under some circumstances, rise to the level of a constitutional taking. *See, e.g., Olson*, 71 Wash.2d at 285, 428 P.2d 562 (finding no constitutional taking, in part because the property damage was "neither contemplated by the plan of the work, nor was it a necessary incident in the building or maintenance of the road"); *Songstad v. Municipality of Metro. Seattle*, 2 Wash.App. 680, 682, 472 P.2d 574 (Wash.Ct.App.1970) (same); *see also Snavely v. Goldendale*, 10 Wash.2d 453, 455–56, 117 P.2d 221 (Wash. 1941) ("While polluting a stream is generally held to be tortious, it may assume the character of a taking or damaging of property ... when a municipal corporation does it on such a scale as to create a public nuisance."); *Dickgieser v. State*, 153 Wash.2d 530, 541, 105 P.3d 26 (Wash.2005) ("governmental torts do not become takings simply because the alleged tortfeasor is the government"); *Richards v. Washington Terminal Co.*, 233 U.S. 546, 557, 34 S.Ct. 654, 58 L.Ed. 1088 (1914) (holding that when the government uses its land in such a way to create a nuisance, the action may rise to the level of a taking when the burden placed on the plaintiff is "direct and peculiar and substantial").

Washington law also divides takings from governmental torts based on the duration of the government's interference with the property right, holding that temporary interferences with a property right are not constitutional takings of property. *See Northern Pacific Railway Co. v. Sunnyside Valley Irrigation Dist.*, 85 Wash.2d 920, 924, 540 P.2d 1387 (Wash.

1975) ("The major decisions of this court considering the difficult distinction between a constitutional taking under [the Washington state constitution's] article 1, section 16, and a mere tortious interference, are in agreement that a constitutional taking is a permanent (or recurring) invasion of private property."); *Miotke v. Spokane*, 101 Wash.2d 307, 334, 678 P.2d 803 (Wash.1984) ("While permanent or long-term pollution of a stream resulting from sewage disposal may constitute a taking, the rule is quite different where the pollution is temporary .... the results of the bypass were temporary only, and therefore do not constitute a constitutional taking."); *Wong Kee Jun v. Seattle*, 143 Wash. 479, 505, 255 P. 645 (Wash.1927) ("A mere temporary interference with a private property right in the progress of the work ... would probably be tortious only."); *Stern v. City of Spokane*, 73 Wash. 118, 121, 131 P. 476 (Wash.1913) ("If the testimony had shown a temporary obstruction incident to the repair of the street, no recovery would have been allowed."); *Olson*, 71 Wash.2d at 285, 428 P.2d 562 ("The present case falls into the category referred to in *Wong Kee Jun* ... as a 'mere temporary interference with a private property right[.]'"); *Songstad*, 2 Wash. App. at 682, 472 P.2d 574 ("[A]n inverse condemnation has not occurred unless the damage is contemplated by the plan of work or considered to be a necessary incident of the maintenance of the property for a public purpose. Moreover, the interference with the property must be of a permanent nature."). Indeed, the Washington Supreme Court has expressly held that "[t]emporary interference with a private property right, which is not continuous nor likely to be reoccurring, does not constitute condemnation without compensation." *Northern Pacific Railway Co.*, 85 Wash.2d at 924, 540 P.2d 1387. Damage is considered "permanent" if the property "may not be restored to its original condition." *Id.*

 Takings law is notoriously known for its lack of doctrinal purity or coherence,[1] and Washington's takings case law, like federal case law, does recognize that a "temporary taking" of property may occur in the context of *governmental regulation of property*. Washington case law also makes plain that to be a compensable temporary regulatory taking, the government regulation must "deny a landowner all economical use of his or her property." *Guimont v. Clarke*, 121 Wash.2d 586, 598, n. 3, 854 P.2d 1 (Wash.1993) (recognizing that temporary takings are compensable "where the regulation denies the owner all use of his or her land"); *see also Sintra, Inc. v. City of Seattle*, 131 Wash.2d 640, 656, 935 P.2d 555 (Wash.1997) ("a temporary regulatory taking is no different in kind from a permanent taking"); *City of Seattle v. McCoy*, 101 Wash.App. 815, 829, 4 P.3d 159 (Wash.Ct.App.2000) (" '[T]emporary' takings are subject to the same categorical treatment as permanent takings where the regulation denies all use of the property."); *English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318, 321, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (finding temporary regulatory takings that "deny a landowner all use of his property" are not different in kind from compensable permanent takings, and expressly limiting its holding to the allegation that the regulation in question denied the plaintiff all use of its property).

With the foregoing background in mind, the Court turns to the sub-claims that make up Plaintiffs' inverse condemnation cause of action. Because it is undisputed

---

**1.** *See* Carlos A. Ball, *The Curious Intersection of Nuisance and Takings Law*, 86 B.U. L. Rev. 819, 821 n. 7 (2006) (citing authorities).

that no physical taking or appropriation of Plaintiffs' property occurred, Dkt. No. 39, Exh. P, Plaintiffs' inverse condemnation cause of action is based on their allegation that Defendants' actions with respect to the stub tunnel's construction constituted an unconstitutional "taking" of their "bundle of property rights" related to the Pine Street property, to wit: (1) their right of access; (2) their right to light, air, and view; (3) their right of quiet enjoyment; and (4) their right to lease and/or dispose of the property (or, in the case of Pande Cameron, their right to their leasehold interest in the property).

### 1. *Right of Access*

To establish a "takings" based on a denial of right of access, Plaintiffs must establish that their right of access to the Pine Street property was eliminated or substantially impaired. *See Keiffer v. King County*, 89 Wash.2d 369, 373, 572 P.2d 408 (Wash.1977). Plaintiffs must show "more than mere inconvenience at having to travel a further distance to [their] business facility." *Union Elevator & Warehouse v. State*, 96 Wash.App. 288, 296, 980 P.2d 779 (Wash.Ct.App.1999). Indeed, "[c]ircuity of route, resulting from an exercise of the police power, is an incidental result of a lawful act. It is not the taking or damaging of a property right." *Walker v. State*, 48 Wash.2d 587, 590–91, 295 P.2d 328 (Wash.1956); *see also* R.C.W. § 47.52.041 (regarding road closures, "[c]ircuity of travel shall not be a compensable item of damage."). If a property owner is deprived of his or her most "direct and convenient" access to his or her property, that is insufficient to maintain an inverse condemnation action. *See Capitol Hill Methodist Church v. Seattle*, 52 Wash.2d 359, 366, 324 P.2d 1113 (1958)

("[t]he fact that the lot owner may be inconvenienced or that he may have to go a more roundabout way to reach certain points" does not result in a compensable injury). Moreover, "[t]hose actions taken pursuant to the police power for the purpose of regulating the flow of traffic on the public way itself are generally not compensable." *Keiffer*, 89 Wash.2d at 372, 572 P.2d 408. In addition, the property owner must demonstrate that he or she has suffered special damage different in kind and not merely in degree from that sustained by the general public. *Capitol Hill Methodist Church*, 52 Wash.2d at 365, 324 P.2d 1113.

In *Mackie v. City of Seattle*, 19 Wash. App. 464, 576 P.2d 414 (Wash.Ct.App. 1978), the plaintiff complained that because of a permanent street closure, he and his customers were required to drive several additional blocks to reach his business. The plaintiff received numerous complaints from customers unable to locate his business. However, the Washington Court of Appeals held that the plaintiff was not entitled to damages, as "[t]he plaintiff and his customers still have access to the property. The fact that access is deflected a few blocks and will be inconvenient due to the closure ... does not raise such inconvenience to the status of a special injury not suffered by the general public." *Mackie*, 19 Wash.App. at 469, 576 P.2d 414.

Here, taking Plaintiffs' factual allegations as true, the Court finds that Plaintiffs have failed to establish a cognizable "right of access" taking claim for the time period between April 2004, when the stub tunnel construction began, through January 2005, when Pande Cameron vacated the Pine Street property.[2] While

**2.** Relying on *Keiffer*, Plaintiffs seem to assert that all right of access takings claims must go to a trier of fact. However, *Keiffer* set forth a two-step inquiry. The first step is to determine if the government action in question has actually interfered with the right of access as that property interest has been defined by

Plaintiffs complain about "closed or blocked lanes of travel," "traffic tie-ups," "streets being reorganized and coned," and the like, these constituted intermittent inconveniences and annoyances that were incidental to the stub tunnel's construction, were related to "regulating the flow of traffic on the public way," and do not rise to the level of a constitutional taking. *See, e.g., Walker,* 48 Wash.2d at 590–91, 295 P.2d 328; *Keiffer,* 89 Wash.2d at 372, 572 P.2d 408. Indeed, Charles Andonian agreed that the construction-related traffic issues could be described as "a series of individual incidents, a truck is blocking the way or a flagman is misdirecting traffic, those type of things." Dkt. No. 39, Exh. P. Similarly, Plaintiffs' allegations concerning the periodic parking of construction equipment and vehicles near the Pande Cameron building during construction activities is not the sort of government conduct that gives rise to an inverse condemnation claim. Further, Plaintiffs acknowledge that Pande Cameron's parking lot was never fenced shut during construction and that "there was always—it had open access," Dkt. No. 59, Exh. G, and Bradley Andonian testified that he could not identify any customers who Pande Cameron lost or would not come into the store during the stub tunnel's construction, Dkt. No. 59, Exh. H.

Regarding the sidewalk on Pine Street, the record, including Plaintiffs' photographs, reveals that the sidewalk in front of the Pande Cameron building was never completely closed and largely remained open while Pande Cameron was located at 815 Pine Street. Bradley Andonian testified that there was never a time while Pande Cameron was located at 815 Pine Street during construction that employees or customers could not physically access the building. Dkt. No. 39, Exh. R; *see also* Dkt. No. 60, ¶ 6 ("At no time was Pande Cameron denied access to either the parking lot or the Pine Street Property."). Bradley Andonian also testified that customers could always access Pande Cameron's front door on Pine Street. Dkt. No. 39, Exh. R. The record shows that the greatest inconvenience to customers was that, when a portion of the sidewalk near the corner of Ninth Avenue and Pine Street was closed, customers walking to the store from Ninth Avenue south of Pine Street would need to turn around and go around the block to get to the front door of Pande Cameron. *Id.* Charles Andonian could not recall how long this detour lasted, but that it was a matter of "weeks." Dkt. No. 59, Exh. G. The detour did not result in any lost customers. Dkt. No. 59, Exh. H. In any case, the fact that some customers occasionally had to travel an extra couple of blocks to reach Pande Cameron's front door does not give rise to a constitutional "taking." *See, e.g., Walker,* 48 Wash.2d at 590–91, 295 P.2d 328 (holding that "circuity of route" is not the taking or damaging of a property right); *Capitol Hill Methodist Church,* 52 Wash.2d at 366, 324 P.2d 1113 (holding that a more "roundabout" route does not result in a compensable injury).

 With respect to the period of time between when Pande Cameron left the Pine Street property at the end of January 2005 and when the Andonians sold the property (or demolished the building), the

Washington law. *Keiffer,* 89 Wash.2d at 372, 572 P.2d 408. This is a question of law that may be resolved at summary judgment. If the court determines that the government interfered with a cognizable "right of access" property interest, the second step is to determine whether the degree of impairment was substantial. *Id.* at 373, 572 P.2d 408. *Keiffer* held that the second step should be determined by the trier of fact. *Id.* at 374, 572 P.2d 408. However, in this case the inquiry does not extend beyond the first step which is to be determined by the Court.

Court assumes for the purposes of summary judgment that Sound Transit "substantially impaired" the Andonians' right of access to the property. For example, Bradley Andonian testified that after Pande Cameron left, "they put a 'sidewalk closed' sign up" and that "at times, you know, well, they took the sidewalk out all the way to the building." Dkt. No. 51, Exh. 11. Moreover, Plaintiffs' photos taken in 2006 reveal that the sidewalk surrounding the Pande Cameron building appears to be at least partially blocked, closed, or removed. See Dkt. No. 50. Sound Transit also concedes that it conducted the stub tunnel construction differently after Pande Cameron moved and did not continue the same mitigation measures it used when there were tenants in the building.[3] Dkt. No. 60, ¶ 4.

However, the Andonians' claim nonetheless fails because there is no authority under Washington law for a temporary "right of access" takings claim. While there is authority for a "temporary taking" claim in Washington, that is only in the context of governmental regulation of property that has deprived the owner of all economical use of his or her property. See, e.g., Guimont v. Clarke, 121 Wash.2d 586, 598, n. 3, 854 P.2d 1 (Wash.1993);

City of Seattle v. McCoy, 101 Wash.App. 815, 829, 4 P.3d 159 (Wash.Ct.App.2000); see also English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 318, 321, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). That situation is not presented here: Plaintiffs do not identify any specific government regulation that regulated their property at 815 Pine Street.[4] In this case, the Andonians' access to the Pine Street property after Pande Cameron moved was temporarily impaired, not because of any governmental regulation, but as an incident of Sound Transit's lawful construction of the stub tunnel on and beneath Pine Street. To hold that the Andonians have asserted a cognizable temporary "right of access" takings claim (arising out of a temporary, lawful public works construction project), would expand takings jurisprudence in the state of Washington beyond its current bounds. Moreover, the practical effect of such a holding would be to place all public construction projects which temporarily impair a property owner's access to his or her property in jeopardy of a constitutional takings claim. The law does not support this expansion.

Plaintiffs cite City of Seattle v. McCoy, 101 Wash.App. 815, 4 P.3d 159 (Wash.Ct. App.2000) and United States v. General

---

**3.** It is important to note that, after Pande Cameron left the building, Sound Transit was not aware of any attempts by the Andonians to lease the property, and in the spring of 2006 Sound Transit learned that the Andonians had obtained a permit to demolish the building. Dkt. No. 60, ¶ 4. In addition, neither the Andonians nor Pande Cameron contacted or complained to Sound Transit about the stub tunnel's construction after Pande Cameron moved. Id., ¶ 5; Dkt. No. 59, Exh. J. If the Andonians had requested that Sound Transit maintain access to the Pine Street property as when Pande Cameron was in the building, Sound Transit would have done so. Dkt. No. 60, ¶ 5.

**4.** While Plaintiffs refer broadly to Ordinance 119975, the Transitway Agreement, and the

EIS, see Dkt. No. 63 at 31, 33–34 and Dkt. No. 74 at 8–9, Plaintiffs fail to demonstrate how these items regulated their property. In any case, none of the items regulated Plaintiffs' property: Ordinance 119975 authorized the City of Seattle to enter into an agreement with Sound Transit to allow the non-exclusive use of certain City of Seattle streets and rights-of-way for the Central Link Light Rail Project, Dkt. No. 47, Exh. J; the Transitway Agreement is the agreement between the City of Seattle and Sound Transit providing for Sound Transit's non-exclusive use of certain City streets and rights-of-way for the Central Link Light Rail Project, Dkt. No. 47, Exh. K; and the EIS is the Environmental Impact Statement for the Central Link Light Rail Project, Dkt. No. 51, Exh. 6 (excerpt only).

*Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945) for the proposition that constitutional takings can be temporary. That is true. However, these cases are nonetheless unavailing to Plaintiffs because neither concerned "right of access" takings claims, and, moreover, in both cases the plaintiffs were deprived of possession of their property and could not put their property to any economic use. *McCoy* concerned a court order, issued pursuant to Washington's drug nuisance statute, that temporarily closed the plaintiffs' building and restaurant business because of illegal drug activity. The court found that the plaintiffs were not in possession of their property and could not put the property to any economic use until the court order was lifted. *See McCoy*, 101 Wash.App. at 829, 4 P.3d 159. In *General Motors*, a World War II era case, the United States Government condemned and temporarily took over an automobile parts warehouse in Chicago for the war effort. The property owner lost possession of the warehouse and could not make any economic use of its property. *See General Motors*, 323 U.S. at 375, 65 S.Ct. 357. Here, in contrast with the facts in *McCoy* and *General Motors*, the Andonians retained possession of the Pine Street property, leased part of the property to Diamond Parking, and later sold the property to Security Properties, Inc.

### 2. *Right to Light, Air, and View*

▮ Plaintiffs also assert a "takings" claim based on a denial of their right to light, air, and view at the Pine Street property. However, this claim fails for the same reasons as their right of access claim. For the period of construction during which Pande Cameron occupied the building on Pine Street, Plaintiffs have failed to create a triable issue of fact regarding whether Defendants denied Plaintiffs their right to light, air, and view. Indeed, Plaintiffs have failed to set forth facts specifically demonstrating how they were deprived of their right to light, air, and view during the stub tunnel's construction. Also, concerning the period of time after Pande Cameron moved to Westlake Avenue, as with Plaintiffs' temporary "right of access" takings claim, there is no authority under Washington law for a temporary "right to light, air, and view" takings claim. In addition, Washington case law holds that lawful construction on government property that results in the obstruction of a property owner's view does not establish a takings claim. *See Pierce v. Northeast Lake Wash. Sewer & Water Dist.*, 123 Wash.2d 550, 560, 562, 870 P.2d 305 (1994) (holding that a utility district's construction of a water tank that obstructed a property owner's view did not constitute a taking or damaging of property).

### 3. *Right to Quiet Enjoyment*

▮ Plaintiffs' "takings" claim based on a denial of their right to quiet enjoyment also falls short. First, while Plaintiffs complain of loud noises, vibrations, and dust and debris generated by the stub tunnel's construction, Plaintiffs have failed to demonstrate if or how the construction produced noise, vibrations, and dust beyond that typical to any major downtown construction project. Moreover, because the government is charged with carrying out certain functions for the public good, such as building a light rail line in a urban environment, it is inevitable that it will impose some annoyances and harms on nearby property owners, and the government should not be liable under a constitutional takings theory to the same extent that a private owner might be liable under nuisance doctrine. *See* Carlos A. Ball, *The Curious Intersection of Nuisance and Takings Law*, 86 B.U. L. REV. 819, 858 (2006). The government "must have a greater ability than private land owners to interfere with the use and enjoyment of property before liability attaches." *Id.* at

856; *see also Gaines v. Pierce County*, 66 Wash.App. 715, 725, 834 P.2d 631 (Wash. Ct.App.1992) (holding that an inverse condemnation plaintiff must prove a government "taking" of property greater than "a mere tortious interference").

 Second, as with Plaintiffs' "right of access" and "right to light, air, and view" claims above, there is no authority under Washington law for a temporary "right to quiet enjoyment" takings claim. The cases relied upon by Plaintiffs all concern *permanent* interferences with a property owner's right to quiet enjoyment. *See, e.g., Jacobs v. Seattle*, 93 Wash. 171, 160 P. 299 (1916) (city garbage incinerator); *Aliverti v. City of Walla Walla*, 162 Wash. 487, 298 P. 698 (1931) (sewage disposal plant); *Ackerman v. Port of Seattle*, 55 Wash.2d 400, 348 P.2d 664 (Wash.1960) (airport).

Third, there is no evidence put forth by Plaintiffs that the noise, vibrations, and dust that they experienced was any different than the noise, vibrations, and dust endured by the rest of the surrounding neighborhood during the stub tunnel's construction, which is a prerequisite for liability under a takings theory. *See Central Puget Sound Regional Transit Authority v. Eastey*, 135 Wash.App. 446, 458, 144 P.3d 322 (Wash.Ct.App.2006) (noise and dust construction impacts that are felt by the public at large are not compensable); *see also Clute v. North Yakima & Valley Railway Co.*, 62 Wash. 531, 534, 114 P. 513 (1911) (damage from noise and dust that "the public would generally suffer" is not a compensable taking or damaging of property).

#### 4. *Right to Lease and/or Dispose of Property*

 Plaintiffs also assert that the stub tunnel's construction deprived the Andonians of their right to lease and/or dispose of the Pine Street property and deprived Pande Cameron of its leasehold interest in the property. This claim only applies to the period of time after Pande Cameron (and later the Woodside/Braseth art gallery) vacated the Pine Street property at the end of January 2005.

With respect to the Andonians, they have not provided any authority, and the Court is not aware of any authority, for a temporary "right to lease" takings claim under facts similar to the instant case. During the relevant period, the Andonians: (1) retained possession of the Pine Street property; (2) leased a portion of the property to Diamond Parking; and (3) disposed of the property to Security Properties, Inc. Moreover, the Andonians do not deny that they could have leased the property had an interested and suitable tenant approached them (although no such tenant did). The authority relied upon by the Andonians in support of their right to lease and/or dispose of property claim is inapposite because the Andonians were able to sell the Pine Street property. *See Martin v. Port of Seattle*, 64 Wash.2d 309, 391 P.2d 540 (Wash.1964) (plaintiffs alleged low-flying jet aircraft from airport precluded them from selling their homes).

Regarding Pande Cameron's claim that the stub tunnel's construction deprived it of its leasehold interest in the Pine Street property, Pande Cameron admitted that it made a business decision in 2003, prior to the start of the construction of the stub tunnel, to vacate the Pine Street property. Dkt. No. 39, Exh. R. Accordingly, Pande Cameron cannot now assert that the impacts from the stub tunnel's construction deprived it of its leasehold interest in the Pine Street property: Pande Cameron decided to give up its leasehold interest before the construction began. Moreover, Pande Cameron moved its business to the Westlake Avenue building at the end of January 2005. *Id.* Therefore, Pande Cameron cannot claim that the construction impacts after it left the Pine Street build-

ing—and after which Sound Transit discontinued its mitigation measures—deprived it of its leasehold interest in the property because it had already moved and, consequently, was not around to experience those construction impacts.

Accordingly, Plaintiffs' inverse condemnation claim is dismissed.[5]

### D. *Plaintiffs' Substantive Due Process Claim*

▮▮▮▮▮ Plaintiffs' second cause of action is a claim that their substantive due process rights were violated. However, claims for substantive due process violations generally arise in the context of a land use regulation. *See Sintra, Inc. v. Seattle,* 119 Wash.2d 1, 12, 829 P.2d 765 (Wash.1992) ("We have previously held that land use regulations which too drastically curtail property owners' use of their property either may cause a constitutional taking or may constitute a denial of substantive due process."); *Presbytery of Seattle v. King County,* 114 Wash.2d 320, 329, 787 P.2d 907 (1990) ("In this state, a land use regulation which too drastically curtails owners' use of their property can cause a constitutional 'taking' or can constitute a denial of substantive due process. These two constitutional theories are *alternatives* in cases where overly severe land use regulations are alleged.") (Emphasis in original.); *Orion Corp. v. State,* 109 Wash.2d 621, 747 P.2d 1062 (Wash.1987) (concerning a land use regulation). Here, Plaintiffs do not identify any specific government land use regulation that regulated their property at 815 Pine Street. *See* footnote 4, *supra.* In addition, the only remedy for a substantive due process vio-

lation in the land use context is the invalidation of the regulation. *See Presbytery of Seattle,* 114 Wash.2d at 332, 787 P.2d 907 (holding that the remedy for a pure substantive due process claim is invalidation of the regulation at issue, and that monetary compensation is not warranted). Plaintiffs are not seeking invalidation of a land use regulation. *See* Complaint, pg. 10. Accordingly, Plaintiffs' substantive due process claim is dismissed.

### E. *Plaintiffs' 42 U.S.C. § 1983 Claim*

Plaintiffs also assert three claims which are brought under the federal civil rights statute, 42 U.S.C. § 1983. Specifically, Plaintiffs bring under § 1983 claims for violations of their substantive due process rights, their rights under the federal Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"), and their procedural due process rights.

#### 1. *Substantive Due Process*

▮▮▮▮ Plaintiffs' substantive due process claim brought under § 1983 fails because Plaintiffs' inverse condemnation claim (first cause of action) and substantive due process claim (second cause of action) each fail. A § 1983 action cannot be maintained unless a federal right has actually been violated. *Quintanilla v. City of Downey,* 84 F.3d 353, 355 (9th Cir.1996).

▮▮▮ Moreover, a substantive due process claim brought under § 1983 faces an "exceedingly high burden": only "arbitrary" conduct amounting to "an abuse of power lacking any reasonable justification in the service of a legitimate governmental objective" is cognizable. *See Shanks v.*

---

**5.** Although the Court finds there is no basis for Plaintiffs' inverse condemnation claim, this does not necessarily mean that persons in the position of Plaintiffs are left without remedies when faced with a substantial impact on their business from public construction activities. It is possible that Plaintiffs could have a

nuisance or other tort remedy available. That issue, however, is not before the Court. The Plaintiffs filed a nuisance claim against Defendants in a prior lawsuit in 2004, Dkt. No. 39, Exh. D, but that lawsuit was later voluntarily nonsuited.

*Dressel,* 540 F.3d 1082, 1088 (9th Cir.2008) (internal quotations omitted); *see also Sintra, Inc. v. City of Seattle,* 119 Wash.2d 1, 23, 829 P.2d 765 (Wash.1992) (holding that a land use decision being challenged under § 1983 denies substantive due process only if it is "invidious or irrational").[6] As a matter of law, Plaintiffs have failed to meet that burden in this case.

## 2. Uniform Relocation Assistance Act

At oral argument, Plaintiffs acknowledged that their URA claim brought under § 1983 has been abandoned. Accordingly, this claim is dismissed.

### 3. Procedural Due Process

▮ Plaintiffs also assert under § 1983 that their procedural due process rights were violated. Plaintiffs allege that Sound Transit did not provide a claims procedure for property owners whose property was not physically acquired or occupied by Sound Transit. While Sound Transit advised that property owners whose property was not physically acquired should still file a claim, Plaintiffs allege that filing a claim would have been futile because of Sound Transit's policy to deny claims that did not involve property being physically acquired or occupied.

▮ Plaintiffs' procedural due process claim fails because Plaintiffs' inverse condemnation claim fails; in other words, Plaintiffs have not demonstrated a "taking" of their property for which they were owed procedural due process. In addition, the Just Compensation Clause of the Fifth Amendment to the United States Constitution does not require pre-taking process or compensation: a state inverse condemnation action is all the procedure that is due if a property owner contends the government has taken his or her property.[7] *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 195 n. 14, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) ("[T]he Just Compensation Clause has never been held to require pretaking process or compensation."); *Cassettari v. County of Nevada,* 824 F.2d 735, 738–39 (9th Cir.1987) ("The Constitution ... does not require a state to provide pre-taking notice, an opportunity to be heard, or pre-taking compensation.... [Plaintiff's] allegations that the County failed to give him notice, an opportunity to be heard, or pre-taking compensation ... do not allege the violation of a federal right and are insufficient to support a section 1983 claim."); *Presley v. City of Charlottesville,* 464 F.3d 480, 490 (4th Cir.2006) (holding that because state law provides for an inverse condemnation action, plaintiff cannot assert a procedural due process violation in a § 1983 action).[8]

---

6. Plaintiffs also take issue with a fund established to "provide monetary compensation to businesses affected by [the Martin Luther King, Jr. Way segment] of the Sound Transit light rail project," Dkt. No. 64, ¶ 21, but no such fund being established for Plaintiffs and their neighbors on Pine Street. However, this allegation suffers from an absence of evidence supporting it: there is no evidence in the record regarding the fund (other than of its existence), including, for example, which businesses received payments from the fund, why they received payments (*i.e.,* what were the requirements to receive compensation), and whether the businesses were similarly situated to Plaintiffs.

7. While Plaintiffs assert that the Washington State Constitution requires pre-taking compensation, the Court does not have to reach this issue. Plaintiff's procedural due process claim is brought under § 1983, which is "a method for vindicating *federal rights.*" *Baker v. McCollan,* 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (emphasis added).

8. Plaintiffs filed a motion to strike the deposition testimony corrections and declaration of Roger Hansen, Dkt. No. 72 (pgs. 7–10). The Court is concerned about the extent to which 30(b)(6) deposition testimony was sought to be "corrected" by Sound Transit. Neverthe-

Accordingly, because Plaintiffs' inverse condemnation and substantive due process claims fail, their procedural due process claim does as well. Plaintiff's 42 U.S.C. § 1983 claim is dismissed.

### F. Defendant City of Seattle

■ The foregoing reasoning is applicable to both Defendant Sound Transit and Defendant City of Seattle. However, as an additional basis for dismissing Plaintiffs' claims against the City of Seattle, the Court finds that Plaintiffs have failed to demonstrate that the City was sufficiently involved in the stub tunnel's construction to confer liability against the City.

The evidence shows that the stub tunnel was constructed by Sound Transit, and that the City's involvement was peripheral to the actual construction of the stub tunnel that gave rise to the construction impacts which Plaintiffs challenge in this lawsuit. Specifically, the evidence reveals that the City's involvement included participating in the environmental review of the Central Link Light Rail Project, reviewing and approving construction plans, issuing permits for construction, enacting Ordinance 119975, entering into the Transitway Agreement with Sound Transit, participating in the utilities relocation work, and monitoring compliance with its permits and ordinances during construction.

■ The City's participation in the lengthy environmental review process of the Central Link Light Rail Project is too far removed to confer liability for construction impacts that allegedly occurred during Sound Transit's construction of the stub tunnel. With regard to the City's review and approval of construction plans and issuance of permits for construction, Washington case law holds that approval

and permitting by a municipality, by itself, will not give rise to liability for inverse condemnation. See Phillips v. King County, 136 Wash.2d 946, 963, 968 P.2d 871 (1998) ("[W]e reject the contention that a municipality will be liable for a developer's design which causes damages to neighbors when the county's only actions are in approval and permitting.") While Plaintiffs argue that Phillips supports their position, that is not the case: Phillips held that the County could not be liable for approval and permitting, but could be held liable for allowing the placement of drainage devices on County property that were intended to drain water onto the plaintiffs' property. Here, the City only issued permits to allow construction to take place in the right-of-way; it did not authorize its property "to be used as a conduit" for an intended physical invasion of Plaintiffs' property, as in Phillips. See Phillips, 136 Wash.2d at 967–68, 968 P.2d 871 ("[T]he County's action here was not simply approval and permitting—it was actual involvement in the drainage project.")

The City also enacted Ordinance 119975 and entered into the Transitway Agreement with Sound Transit. However, Plaintiffs fail to demonstrate how these items regulated their property at 815 Pine Street. See footnote 4, supra.

In addition, the City participated in the utilities relocation work for the stub tunnel's construction. Charles Andonian testified that City Light vehicles temporarily blocked access to the alley between the Pande Cameron building and the Tower 801 apartment building, and intermittently blocked the view of the awning in front of the Pande Cameron building. Dkt. No. 51, Exh. 16; Dkt. No. 56, Exh. A. However, the Court holds that the City's involve-

less, in light of the reasons for dismissing Plaintiffs' § 1983 claim, the motion to strike, Dkt. No. 72 (pgs. 7–10), is denied as moot.

ment in the utilities relocation phase of the stub tunnel's construction is insufficient as a matter of law to confer liability against the City.

 The City also monitored compliance with its permits and ordinances during construction, and Plaintiffs allege that the City failed to do so. However, under the public duty doctrine, liability cannot be conferred upon local governments for failing to ensure compliance with applicable laws and codes. *See Atherton Condominium Apartment–Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wash.2d 506, 529, 799 P.2d 250 (Wash.1990) (holding that the duty to ensure compliance rests with individual permit applicants and builders). Indeed, as the Washington Supreme Court recognized in *Atherton Condominium*, "legislative enactments for the public welfare should not be discouraged by subjecting a governmental entity to unlimited liability" for failing to ensure compliance with the enactments. *Id.* at 530, 799 P.2d 250.

## V. CONCLUSION

For the foregoing reasons, Defendant Sound Transit's motion for summary judgment, Dkt. No. 38, is GRANTED, Defendant City of Seattle's motion for summary judgment, Dkt. No. 45, is GRANTED, and Plaintiffs' joint motion for summary judgment, Dkt. No. 50, is DENIED.